**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION**

| | |
|---|---|
| **CHARLES F. PLYMAIL,** | ) |
| | ) |
| **Petitioner,** | ) |
| | ) |
| **v.** | )    **Civil Action Nos. 3:14-06201** |
| | ) |
| **PATRICK A. MIRANDY, Warden,** | ) |
| | ) |
| **Respondent.** | ) |

**PROPOSED FINDINGS AND RECOMMENDATION**

Pending before the Court is Respondent's Motion for Summary Judgment (Document No. 89), filed on March 1, 2018. Having thoroughly examined the record in this case, the undersigned respectfully recommends that the District Court grant Respondent's above Motion.

**PROCEDURAL AND FACTUAL HISTORY**

**A.      Criminal Action No. 93-F-50:**

On January 7, 1993, the Grand Jury of Cabell County, West Virginia, returned an Indictment against Petitioner charging him with one count of second degree sexual assault of Kathy Young.; one count of burglary of Teresa Salow's home; two counts of first degree sexual assault of Teresa Salow; one count of first degree sexual abuse of Teresa Salow; and one count of maliciously wounding Karen Lucas (Teresa Salow's roommate). State v. Plymail, Criminal Action No. 93-F-50 (Cir. Ct. Cabell Co. August 18, 2013). (Document No. 88-1, p. 3.) On August 4, 1993, the State decided to proceed to trial only on the sexual assault charge involving Karen Young because laboratory results concerning the remaining counts were not yet available.

1

(Id.) Following a two-day jury trial beginning on August 18, 1993, Petitioner was convicted of second-degree sexual assault of Karen Young. (Document No. 88-5.) On August 30, 1993, the State filed a Recidivist Information against Petitioner alleging that Petitioner had at least two prior felony convictions (1989 conviction for third-degree sexual assault; 1984 conviction for armed robbery). (Document No. 88-6.) On September 9, 1993, Petitioner appeared for his arraignment on the recidivist information, but the arraignment was continued at Petitioner's request. (Document No. 88-22, pp. 11 – 12.) Also on September 9, 1993, Petitioner requested that trial counsel be relieved as counsel and he be allowed to proceed *pro se*.[1] (Id., pp. 30 – 38.) The Circuit Court granted Petitioner's request and appointed stand-by counsel. (Id.) Subsequently, Petitioner filed his Motion to Set Aside Verdict. On December 1, 1993, December 6, 1993, December 20, 1993, and February 14, 1994, the Circuit Court conducted hearings on Petitioner's Motion to Set Aside Verdict. (Document Nos. 88-23, 88-24, 88-25, and 88-26.) On February 14, 1994, the Circuit Court denied Petitioner's Motion to Set Aside Verdict. (Document No. 88-26, pp. 78 – 84.) Also on February 14, 1994, the Circuit Court conducted Petitioner's arraignment on the recidivist information and Petitioner filed a Motion to Dismiss the Recidivist Information arguing that his arraignment was untimely under West Virginia Code §§ 61-11-18 and 61-11-19. (Id., pp. 86 – 108) Following the denial of Petitioner's Motion to Dismiss the Recidivist Information, Petitioner was arraigned and he admitted his two prior felony convictions. (Id., pp. 104 - 108.) The Circuit Court sentenced Petitioner to life in prison, with

---

[1] On December 1, 1993, the Circuit Court clarified that both Mr. Beter and Ms. Sheets were relieved as counsel. (Document No. 88-23, p. 3.) Petitioner's Motion to Set Aside Verdict included a claim of ineffective assistance of trial counsel. The Circuit Court conducted a hearing upon the foregoing and heard testimony from Mr. Beter and Ms. Sheets. (Document No. 88-24.)

parole eligibility after serving 15 years. (Id., p. 110 and Document No. 88-9.)

On March 9, 1994, Petitioner filed a Notice of Appeal. (Document No. 58-78.) On March 10, 1994, the Circuit Court appointed Ms. Nancy Sheets as appellate counsel (Id.) On June 15, 1994, Petitioner filed a *pro se* Motion to Dismiss Court-Appointed Counsel and a Motion to Extend the Appeal Period. (Id.) By Order entered on December 9, 1994, the Circuit Court relieved Ms. Sheets as counsel, appointed the Public Defender's Office of Cabell County as counsel. (Document No. 58-78 and Document No. 70, pp. 30 - 31.) Assistant Public Defender Neil Bouchillon was assigned to Petitioner's case and Mr. Bouchillon agreed to serve as Petitioners' "editor/advisor." [2] (Id. and Document No. 84, p. 2.) On June 27, 1995, Mr. Bouchillon filed a Motion to Withdraw as Counsel. (Document No. 58-78) The Circuit Court conducted a hearing on the Motion to Withdraw on July 21, 1995. (Document No. 65, p. 7 and Document No. 84, p. 3.) During the above hearing, Petitioner and Mr. Bouchillon advised the court that they had resolved their differences and Mr. Bouchillon agreed to continue as counsel to act as Petitioner's "editor/advisor" concerning a petition for appeal drafted by Petitioner. (Id.) On February 25, 2008, Petitioner filed a Motion to Dismiss the Public Defender's Office. (Document No. 65, pp. 9, 51 – 52 and Document No. 58-78.) On February 26, 2008, the Circuit Court appointed Mr. Steven M. Bragg as counsel. (Document No. 58-78.) On January 28, 2013, Mr. Bragg filed a Motion to Substitute Counsel (Document No. 58-22.) By Order entered on March

---

[2] In his Affidavit, Mr. Bouchillon states that Petitioner desired to prepare his own draft of an appeal petition and wished Mr. Bouchillon to be "standby counsel only." (Document No. 84, p. 2.) Mr. Bouchillon states that Petitioner's knowledge regarding the facts and legal issues in his case were "extensive." (Id.) Mr. Bouchillon explains that Petitioner showed him research he had done and "[i]t was apparent that he had a competent ability to prepare a petition." (Id.) Mr. Bouchillon, therefore, states that he saw no detriment to permitting Petitioner to prepare a draft of the appeal petition, which Mr. Bouchillon would then edit and submit. (Id.)

28, 2013, the Circuit Court granted Mr. Bragg's Motion and appointed Mr. Nicolas Mayo as appellate counsel. (Id.) On September 19, 2013, Mr. Mayo filed a proposed resentencing order and a Motion to Withdraw as Counsel. (Document No. 58-78.) The Circuit Court entered the Resentencing Order on September 20, 2013. (Document No. 58-79, pp. 30 - 31.) By Order entered on September 24, 2013, the Circuit Court granted Mr. Mayo's Motion to Withdraw as Counsel and appointed Jason Goad as counsel. (Document No. 58-78.) On April 2, 2014, Mr. Goad filed with the WVSCA a Motion to Withdraw as Counsel (Document No. 58-45.) By Order entered on April 17, 2014, the WVSCA granted Mr. Goad's Motion and remanded the case to the Circuit Court for the sole purpose of appointing new counsel. (Document No. 58-46 and 58-47.) The WVSCA further stayed the appeal pending the appointment of new counsel by the Circuit Court. (Document No. 58-46.)

By Order entered on May 29, 2014, the Circuit Court appointed Mr. Ray Nolan as appellate counsel. (Document No. 58-49.) By "Amended Order of Appointment" entered on June 3, 2014, the Circuit Court appointed Mr. Steve Cook[3] as appellate counsel. (Document No. 58-50.) On November 18, 2014, Mr. Cook filed Petitioner's Appellate Brief. (Document No. 58-60.) Petitioner asserted the following assignments of error:

1.    Whether the extraordinary delay in Appellant/Petitioner's right to an appeal should afford Appellant/Petitioner immediate relief in the form of release from prison coupled with an injunction to prevent further prosecution?

2.    Whether the trial court committed plain error and/or reversible error by the trial court's comments to the jury during the deliberation phase and the trial courts limitations on the time frame for completing the trial and jury deliberations and whether the trial court committed plain error and/or

---

[3] Mr. Cook had been recently appointed as co-counsel on Petitioner's State *habeas* case.

reversible error by coercing the jurors into agreeing upon the verdict?

3.    Whether the trial court lacked jurisdiction to use the recidivist statute to enhance Petitioner's conviction to a life sentence, because said enhancement was not done in the same term of Court as the conviction as required by statute?

4.    Whether the Petitioner was misled into waiving his right to testify?

5.    Whether the trial court erred in permitting the prosecutor to use inflammatory language in closing argument, state facts not in evidence in closing argument, as well as appeal to local and general prejudices in closing argument, allowing the prosecutor to discuss and attack Petitioner's pre-trial silence in closing argument, allowing the prosecutor to discuss Petitioner's failure to present witnesses in closing argument, allowing the prosecutor to comment on the Petitioner's failure to testify?

6.    Whether the trial court failed to give a proper in camera hearing and a definitive ruling as to the State's proffered evidence under Rule 404(b) of the West Virginia Rules of Evidence?

7.    Whether the totality of the errors involved, coupled with the totality of the circumstances involved, combined with the extraordinary delay in bring a direct appeal (20) years through no fault of the Petitioner should afford the Petitioner the relief involved?

(Id.) By letter received February 5, 2015, Petitioner provided the WVSCA with a "Waiver of Counsel." (Document No. 58-70.) On February 6, 2015, the State filed its Response Brief. (Document No. 58-67.) On February 13, 2015, Mr. Cook filed a Motion to Withdraw as Counsel. (Document No. 58-72.) By Order entered on February 24, 2015, the WVSCA granted Mr. Cook's Motion to Withdraw as Counsel and directed Petitioner to file his Reply Brief by March 30, 2015. (Document No. 58-73.) On March 30, 2015, Petitioner filed his *pro se* Reply Brief. (Document No. 58-75.) By Memorandum Decision filed on November 20, 2015, the WVSCA affirmed Petitioner's conviction and sentence. State v. Plymail, No. 14-0016 (Nov. 20, 2015); (Document No. 58-76.)

5

**B.     State *Habeas* Petition:**

On March 13, 2013, Petitioner, proceeding *pro se*, filed his Petition for Writ of *Habeas Corpus* in the Circuit Court of Cabell County. <u>Plymail v. Plumley</u>, Case No. 13-C-159 (Cir. Ct. Cabell Co.); (Document No. 28-1.) Petitioner raised the following grounds for *habeas* relief:

1.    The inordinate delay of Petitioner's appeal;

2.    The trial court's coercive remarks to the jury;

3.    The prosecutor's plainly improper closing argument;

4.    Improper sentencing enhancement;

5.    Denial of Petitioner's right to testify; and

6.    Ineffective assistance of trial counsel.

(Document No. 1, p. 3.) By letter dated November 26, 2013, Stacy Adkins, Judge Ferguson's law clerk, inquired as to whether Petitioner wished to proceed with his *habeas* petition or to stay proceedings pending resolution of his direct appeal. (Document No. 58-31.) By letter received on December 11, 2013, Petitioner promptly informed Ms. Adkins that he did not wish to have his *habeas* proceedings stayed and that he would like to have *habeas* counsel appointed. (Document No. 58-35.) By Order entered on December 13, 2013, the Circuit Court appointed Ms. Sarah Dixon as *habeas* counsel and directed that an Amended Petition be filed no later than May 1, 2014. (Document No. 28-1 and 58-36.) Also on December 13, 2013, the State filed its Answer. (Document No. 58-76.) By Order entered on May 2, 2014, the Circuit Court appointed Mr. Steven Cook as co-counsel and granted Petitioner an extension of time "to a date to be determined by the Court" to file an Amended Petition. (Document No. 28-1 and 58-48.) Subsequently, Ms. Dixon accepted employment in the Cabell County Prosecutor's Office and

filed a motion to withdraw as counsel. (Id.) On October 17, 2014, Ms. Dixon was relieved as counsel and Abraham Saad was appointed as counsel. (Document No. 28-1 and Document No. 58-58.) The Court directed that the Clerk of the Court provide a certified copy of the Order to Ms. Dixon, Mr. Saad, Mr. Cook, and the County Prosecutor. (Document No. 58-58.)

By letter dated February 4, 2015, Petitioner notified Mr. Cook that he was dissatisfied with Mr. Cook's work on his direct appeal and waived his "right to any further assistance from you and your kind." (Document No. 58-71.) By letter received February 5, 2015, Petitioner provided the WVSCA with a "Waiver of Counsel" concerning his direct appeal. (Document No. 58-70.) On February 13, 2015, Mr. Cook filed in the WVSCA a Motion to Withdraw as Counsel. (Document No. 58-72.) By Order entered on February 24, 2015, the WVSCA granted Mr. Cook's Motion to Withdraw as Counsel concerning Petitioner's direct appeal. (Document No. 58-73.) By Motion dated June 29, 2015, Mr. Cook requested that the Circuit Court allow him to withdraw as *habeas* co-counsel.[4] (Document No. 72-1.) On June 30, 2015, the Circuit Court granted Mr. Cook's Motion to Withdraw as Co-Counsel and stated that "[a] separate order appointing new counsel will be entered as necessary." (Document No. 58-76 and 72-2.) The Clerk was directed to send a copy of the Order removing Mr. Cook as co-counsel to Mr. Saad. (Document No. 72-2.)

Petitioner states that Mr. Saad made no attempt to communication with him despite that fact that Mr. Saad was appointed as *habeas* counsel. (Document No. 65, p. 20.) Following the Circuit Court's granting of Mr. Cook's motion to withdraw as counsel on June 30, 2015, Petitioner's State *habeas* proceedings laid dormant until May 18, 2016. (Id.) On May 18, 2016, the Circuit Court entered a Scheduling Order noting that "Petitioner had previously indicated he

---

[4] This Motion was filed on July 2, 2015.

did not wish to have an attorney and thus is representing himself." (Document No. 72-4.) The Circuit Court directed that Petitioner file his Amended Petition by July 1, 2016 (approximately six weeks from the date of the Scheduling Order), "or the matter will be dismissed from the docket of this Court." (Id.) On June 29, 2016, Petitioner filed a *pro se* Motion for Extension of Time. (Document No. 72-5.) By Order entered on July 7, 2016, the Circuit Court granted Petitioner's Motion for Extension of Time allowing him until September 1, 2016, to file his Amended Petition. (Document No. 72-6.) On August 30, 2016, Petitioner filed a Motion to Replace Court Appointed Counsel. (Document No. 72-7.) In support, Petitioner stated that he had never filed a motion, letter, or other document waiving his right to counsel in his *habeas* case. (Id.) By Order filed January 18, 2017, the Circuit Court granted Petitioner's Motion, appointed Mr. Michael Meadows as *habeas* counsel, and extended the deadline for Petitioner to file his Amended Petition and Losh List until May 1, 2017. (Document No. 72-8.) On June 16, 2017, more a month and half after the filing deadline, Mr. Meadows filed a Motion requesting an extension of time to file Petitioner's Amended Petition. (Document No. 72-9.) By Order entered on June 21, 2017, the Circuit Court granted Mr. Meadows' Motion extending the filing deadline to August 31, 2017. (Document No. 72-10.) Nearly a month after the passing of his deadline, Mr. Meadows filed an additional Motion for Extension of Time on September 29, 2017. (Document No. 88-27.) The Circuit Court granted the Motion on October 4, 2017. (Id.) The most recent Docket Sheet from the Circuit Court reveals that no Amended Petition had been filed by Mr. Meadows as of February 22, 2018. (Id.)

## C.    Section 2254 Petition:

Petitioner filed the instant Petition Under 28 U.S.C. § 2254 for Writ of *Habeas Corpus*

By a Person in State Custody on January 31, 2014. (Document No. 1.) In his Petition, Petitioner

alleges the following grounds for *habeas* relief (Id., pp. 10 - 25.):

1.    The State's 19-year delay in affording [Petitioner] an appeal of [his]
      criminal conviction violates the due process provisions of the Fourteenth
      Amendment to the United States Constitution.

2.    Because the jurors at [Petitioner's] trial were subjected to judicial
      coercion, [his] conviction was obtained in violation of the due process
      provisions of the Fourteenth Amendment of the United States
      Constitution.

3.    The plainly improper remarks made by the prosecutor during the State's
      rebuttal and closing were prejudicial enough to have denied [Petitioner]
      the right to a fair trial and, thus, violated the due process provision of the
      Fourteenth Amendment to the United States Constitution.

4.    Because [Petitioner's] waiver of the right to testify was based on
      misleading statements made by the court and counsel, [his] conviction was
      obtained in violation of the due process provisions of the Fourteenth
      Amendment to the United States Constitution.

5.    Because the trial court lacked jurisdiction to enhance [Petitioner's]
      sentence under West Virginia's recidivist statute, its imposition of a life
      sentence violated the due process provisions of the Fourteenth
      Amendment to the United States Constitution.

6.    Because [Petitioner] was not provided with effective assistance of counsel,
      [his] conviction was obtained in violation of the Sixth Amendment to the
      United States Constitution.

(Id.)

       As Exhibits, Petitioner attaches the following: (1) A copy of an Order from the WVSCA

filed on December 2, 1994, granting Petitioner's writ of mandamus directing Circuit Court Judge

Alfred E. Ferguson, Jr., "to render a decision within thirty days of this order on the relator's

motion to amend the dismissal order, motion for resentencing, and motion to dismiss Ms. Sheets

as appellate counsel" (Document No. 1, pp. 27 - 30.); (2) A copy of Judge Ferguson's Order

dated April 12, 1995, transporting Petitioner to the care, custody, and control of the Commissioner of Corrections (Id., p. 32.); (3) A copy of a letter from the Public Defender's Office addressed to Petitioner dated May 24, 1995 (Id., p. 34.); (4) A copy of Petitioner's "Re-Sentencing Order" dated July 21, 1995, as filed in the Circuit Court of Cabell County (Id., pp. 36 - 37.); (5) A copy of a letter from Petitioner addressed to Rory L. Perry, Clerk of the WVSCA, dated November 14, 2008 (Id., p. 39.); and (6) A copy of a letter from Petitioner addressed to Chief Justice Elliot E. Maynard dated November 14, 2008 (Id., pp. 40 - 42.).

On February 23, 2015, Petitioner filed his "Supplemental Factual Statement and Exhibits F - M." (Document No. 7.) As Exhibits, Petitioner attaches the following: (1) A copy of Petitioner's "Petition for Writ of Prohibition" as filed with the WVSCA on March 14, 2014 (Id., pp. 5 - 19.); (2) A copy of a letter from Petitioner addressed to Attorney Jason P. Goad dated March 25, 2014 (Id., pp. 21 - 24.); (3) A copy of a letter from Adriana Marshall, Staff Attorney with the WVSCA, addressed to Petitioner dated July 3, 2014 (Id., p. 26.); (4) A copy of a letter from Petitioner addressed to Ms. Marshall dated October 22, 2014 (Id., pp. 28 - 29.); and (5) A copy of letters from Petitioner addressed to Mr. Steven T. Cook, court-appointed counsel, dated October 7, 2014, December 3, 2014, August 21, 2014, January 15, 2015, and February 4, 2015 (Id., pp. 31 - 47.).

By Order entered on February 23, 2015, the undersigned directed Respondent to file a Response to Petitioner's Petition. (Document No. 8.) On March 25, 2015, Respondent filed his Response and "Motion to Dismiss and Incorporated Memorandum." (Document Nos. 13 and 14.) In his "Motion to Dismiss and Incorporated Memorandum," Respondent argued that "Petitioner has yet to exhaust his claims within the State courts, and has yet to have either his direct appeal

or his *habeas* claims properly adjudicated by the SCAWV." (Id.) On April 9, 2015, Petitioner filed his Responses in Opposition and Memorandum in Support. (Document Nos. 18 and 19.) Petitioner argued that the "inordinate and unjustified delay in adjudicating post-conviction claims for relief renders the state judicial process ineffective." (Document No. 19, p. 2.) Respondent filed his Reply on April 10, 2015. (Document No. 20.)

By Proposed Findings and Recommendation entered on December 21, 2015, Judge VanDervort recommended that Petitioner's Petition be dismissed without prejudice based upon his failure to exhaust. (Document No. 31.) Petitioner filed his Objections on January 11, 2016. (Document No. 36.) By Memorandum Opinion and Order entered on March 30, 2016, United States District Judge Robert C. Chambers adopted Judge VanDervort's recommendation and dismissed Petitioner's Petition without prejudice. (Document Nos. 38 and 39.) By per curiam opinion entered on November 23, 2016, the Fourth Circuit vacated and remanded the District Court's decision. (Document No. 50.) The Fourth Circuit determined "that the current state of the record is insufficient to establish as a matter of law that Plymail's petition should be dismissed for failure to exhaust." (Id.)

By Order entered on December 21, 2016, the undersigned directed Respondent to file a Response addressing Petitioner's Section 2254 Petition. (Document No. 55.) The undersigned further directed that to the extent Respondent wished to seek dismissal based upon Petitioner's failure to exhaust, Respondent should specifically address Petitioner's claim that he is excused from the exhaustion requirement because there is an absence of available state corrective process or circumstances exist that render such process ineffective to protect the rights of Petitioner. (Id.)

On February 2, 2017, Respondent filed his Answer, "Second Motion to Dismiss for

Failure to Exhaust," and Memorandum of Law in Support. (Document Nos. 57, 58, 59.) First, Respondent acknowledged that Petitioner's direct appeal exhausted the majority of Petitioner's claims. (Document No. 58, p. 2.) Respondent, however, noted that Petitioner's claim of ineffective assistance of counsel had not been exhausted. (Id.) Second, Respondent stated that Petitioner's State *habeas* proceedings are ongoing and the resolution of these proceedings will result in exhaustion of Petitioner's ineffective assistance of counsel claim. (Id.) Third, Respondent argued that "the delay of Petitioner's State proceedings, in both his direct appeal and State *habeas* proceedings, is in part a result of Petitioner's constant quarreling with appointed counsel." (Id.) As Exhibits, Respondent attaches 79 documents that include Petitioner's communications with counsel, State Court filings, and a copy of Docket Sheets from the Circuit Court. (Document No. 58.)

On February 3, 2017, Notice pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), was issued to Petitioner, advising him of his right to file a response to Respondent's "Second Motion to Dismiss for Failure to Exhaust." (Document No. 60.) On March 17, 2017, Petitioner filed his "Declaration in Opposition to Respondent's Motion to Dismiss" (Document No. 65, pp. 4 – 22) and "Memorandum of Law in Opposition to Respondent's Motion to Dismiss" (Id., pp. 124 - 139). Specifically, Petitioner argued that he should be excused from exhaustion because the "20-year delay in the appellate process is inordinate." (Id.)

As Exhibits, Petitioner attached the following: (1) A copy of a decision by the Lawyer Disciplinary Board's Investigative Panel dated April 26, 1996 (Document No. 65, pp. 25 – 28.); (2) A copy of the WVSCA's Order filed on December 2, 1994, granting Petitioner's Petition for Writ of Mandamus (Id., pp. 30 – 33.); (3) A copy of the Circuit Court's Order lifting the stay of

execution of sentence entered on April 13, 1995 (Id., p. 35.); (4) A copy of a letter from Mr. Bouchillon dated May 24, 1995 (Id., p. 37.); (5) A copy of the Resentencing Order entered on July 27, 1995 (Id., pp. 39 - 40.); (6) A copy of a letter from Mr. Bouchillon dated August 31, 1995 (Id., p. 42.); (7) A copy of Petitioner's "Complaint Form" dated February 12, 2009, as submitted to the Lawyer Disciplinary Board (Id., pp. 44 – 48.); (8) A copy of a letter from Petitioner addressed to Chief Justice Elliot E. Maynard dated November 14, 2008 (Id., pp. 49 – 57.); (9) A copy of Petitioner's draft "Petition for Appeal" (Id., pp. 58 – 101.); (10) A copy of a letter from Mr. Bragg dated September 24, 2012 (Id., p. 103.); (11) A copy of a letter from Petitioner addressed to Mr. Goad dated January 9, 2014 (Id., pp. 105 – 109.); (12) A copy of a letter from Petitioner addressed to Mr. Cook dated August 13, 2014 (Id., pp. 111 – 120.); and (13) A copy of a letter from Mr. Cook dated November 11, 2014 (Id., pp. 121.).

By Proposed Findings and Recommendations entered on May 23, 2017, the undersigned recommended that the District Court grant Respondent's "Second Motion to Dismiss for Failure to Exhaust" (Document No. 58) and dismiss without prejudice Petitioner's Section 2254 Petition. (Document No. 66.) On June 30, 2017, following the granting of an extension of time, Petitioner filed his Objections. (Document No. 70.) By Memorandum Opinion and Order entered on September 27, 2017, United States District Judge Robert C. Chambers accepted Petitioner's Objections, rejected the undersigned's recommendation, denied Respondent's "Second Motion to Dismiss for Failure to Exhaust," directed that Petitioner was excused from the exhaustion requirement of Section 2254,[5] and referred the matter back to the undersigned for further proceedings. (Document No. 74.) On September 27, 2017, the undersigned conducted a hearing

---

[5] Specifically, the District Court determined that there had been an inordinate delay in Petitioner's State *habeas* proceedings. (Document No. 74.)

via video conferencing for purposes of determining whether Petitioner wished to have counsel appointed concerning his Section 2254 proceedings. (Document No. 75.) During the hearing, Petitioner affirmed his request for appointment of counsel and the undersigned granted his request by appointing Troy Giatras as counsel. (Id.) The undersigned further directed that Petitioner had until November 28, 2017 to file any Amended Section 2254 Petition and Respondent should file his Answer within 45 days after the filing of any Amended Petition. (Id.)

Following the granting of two extensions of time for the filing of an Amended Petition, Petitioner, by counsel, filed his Motion for Partial Summary Judgment and Memorandum in Support on January 15, 2018. (Document Nos. 84 and 85.) In support, Petitioner argued that he was entitled to partial summary judgment on his claim that a twenty-year delay in his State appeal violated the Due Process Clause. (Id.) As Exhibits, Petitioner attached the following: (1) The Affidavit of Neil R. Bouchillon (Document No. 84-1.); and (2) A copy of "Petitioner's Supplemental Appendix Record" as filed with the WVSCA on March 27, 2015, which includes attorney-client correspondences and Petitioner's letters to the Circuit Clerk (Document No. 84-2.).

On March 1, 2018, Respondent filed his Answer, "Motion for Summary Judgment," Memorandum in Support, and "Response in Opposition to Petitioner's Motion for Partial Summary Judgment." (Document Nos. 88, 89, 91, 92.) In his "Motion for Summary Judgment," Respondent argues as follows: (1) "The Nineteen (19) year delay in Petitioner's direct appeal is not attributable to the State of West Virginia, and Petitioner did not suffer unconstitutional prejudice as a result of the delay" (Document Nos. 89 and 91, pp. 10 – 15.); (2) "Petitioner's conviction of second degree sexual assault was rendered by a fair and impartial jury. Moreover,

14

the jury was not improperly coerced by the Circuit Court during deliberations" (Id., pp. 16 – 17.); (3) "The prosecutor's remarks during the State's closing rebuttal argument did not violate Petitioner's constitutional right to due process of law" (Id., pp. 17 – 18.); (4) "Petitioner knowingly, intelligently, and voluntarily waived his right to testify in his own defense during trial" (Id., pp. 18 – 19.); (5) "The Circuit Court did not lack jurisdiction to impose a recidivist sentence upon Petitioner because Petitioner requested a continuance of the recidivist hearing until the next term of court" (Id., p. 20.); and (6) "Petitioner fails to adequate support his claim of ineffective assistance of counsel; the facts pled fail to show either that counsel's actions were objectively unreasonable or that Petitioner suffered unconstitutional prejudice as a result" (Id., pp. 21 – 25.). In his "Response in Opposition to Petitioner's Motion for Partial Summary Judgment," Respondent references and incorporates his "Memorandum of Law in Support of his Motion for Summary Judgment" (Document No. 91, pp. 10 – 15). (Document No. 92.)

As Exhibits, Respondent attaches the following: (1) A copy of Petitioner's Indictment as filed in State v. Plymail, Case No. 93-F-50 (Cir. Ct. Cabell Co. Feb. 22, 1994) (Document No. 88-1.); (2) A copy of Petitioner's Pretrial Motions as filed in Case No. 93-F-50 (Document No. 88-2.); (3) A copy of the Circuit Court's "Order to Produce Psychiatric Records" Order denying Petitioner's Motion (Document No. 88-3.); (4) A copy of the Circuit Court's "Order Denying Various Defendant Joint Motions" (Document No. 88-4) (5) A copy of Petitioner's conviction order (Document No. 88-5.); (6) A copy of Petitioner's Recidivist Information (Document No. 88-6.); (7) A copy of Petitioner's *pro se* Motion to Dismiss Information (Document No. 88-7.); (8) A copy of the Circuit Court's Order denying Petitioner's Motion to Set Aside the Verdict and Motion to Dismiss Information  (Document No. 88-8.); (9) A copy of Petitioner's "Amended

Re-Sentencing Order" as filed on November 13, 2013 (Document No. 88-9.); (10) A copy of Petitioner's Appeal Brief as filed with the WVSCA on November 18, 2014 (Document No. 88-10.); (11) A copy of the State's Response Brief as filed with the WVSCA on February 6, 2015 (Document No. 88-11.); (12) A copy of Petitioner's *pro se* Reply Brief as filed with the WVSCA on March 30, 2015 (Document No. 88-12.); (13) A copy of the WVSCA's "Memorandum Decision" filed on November 20, 2015, affirming the decision of the Circuit Court (Document No. 88-13.); (14) A copy of Petitioner's *pro se* Petition for Writ of *Habeas Corpus* as filed with the Circuit Court of Cabell County (Case No. 13-C-159) (Document No. 88-14.); (15) A copy of the transcripts from Petitioner's Preliminary Hearing conducted on September 25, 1992, in Case No. 93-F-50 (Document No. 88-15.); (16) A copy of the transcripts from the hearing conducted on March 12, 1993 and March 17, 1993, concerning Petitioner's pro se motion to dismiss appointed counsel (George D. Beter) in Case No. 93-F-50 (Document Nos. 88-16 and 88-17.); (17) A copy of the transcripts from a pretrial hearing conducted on April 26, 1993 and May 12, 1993, concerning a Motion to Quash a Subpoena for Reporter David Rogers, Motion to Disqualify the Prosecutor's Office, Motion for a Change in Venue, and Motion to Suppress as filed in Case No. 93-F-50 (Document Nos. 88-18 and 88-19.); (18) A copy of the trial transcripts as filed in Case No. 93-F-50 (Document Nos. 88-20 and 88-21.); (19) A copy of the transcripts from a post-trial hearing conducted on September 9, 1993, concerning Petitioner's Motion to Renew the Motion for Judgment of Acquittal and his Motion to Set Aside the Verdict in Case No. 93-F-50 (Document No. 88-22.); (20) A copy of the transcripts from the post-trial hearing conducted on December 1, 1993, December 6, 1993, December 20, 1993, and February 14, 1994, concerning Petitioner's Motion to Set Aside the Verdict in Case No. 93-F-50 (Document Nos.

88-23, 88-24, 88-25, and 88-26.); (21) A copy of the transcripts from Petitioner's post-trial hearing concerning this Motion to Dismiss Information and Sentencing hearing conducted on February 14, 1994, in Case No. 93-F-50 (Document No. 88-26.); and (22) A copy of the Circuit Court's Docket Sheet for Petitioner's State *habeas* case (Case No. 13-C-159) (Document No. 88-27.).

On April 30, 2018, Petitioner, by counsel, filed his "Memorandum in Reply to Respondent's Response in Opposition to Petitioner's Motion for Partial Summary Judgment" (Document No. 96), a "List of Undisputed Facts" (Document No. 96-1), and his "Memorandum in Opposition to Respondent's Motion for Summary Judgment" (Document No. 97).

By Proposed Findings and Recommendation entered on July 20, 2018, the undersigned recommended that the District Court deny Petitioner's Motion for Partial Summary Judgment and remand the case back to the undersigned for further proceedings. (Document No. 98.) After being granted an extension of time, Petitioner filed his Objections on August 28, 2018. (Document No. 102.) Petitioner's Motion for Partial Summary Judgment is currently pending before the District Court.

**<u>FACTUAL BACKGROUND</u>**

On September 13, 1992, Petitioner allegedly sexually assaulted Kathy Young by forcing her to perform oral sex upon him following consensual sexual relations. Ms. Young testified that on September 12, 1992, she went to Calamity Café to meet some friends. (Document No. 88-20, p. 133.) Ms. Young explained that Calamity Café is a restaurant that serves alcohol, which often had a band in the evenings and weekends. (<u>Id.</u>, p. 134.) Ms. Young stated that when she entered the Café on September 12, 1992, she joined her girlfriends that were sitting at the bar. (<u>Id.</u>) Ms.

17

Young acknowledged that she had five or six Bacardi and Cokes while at the Café. (<u>Id.</u>, p. 135.) Ms. Young explained that she met Petitioner at the Café and they engaged in a conversation about "general stuff." (<u>Id.</u>, pp. 136-37.) Ms. Young explained that later in the evening she realized Petitioner was intoxicated when he spilled his drink. (<u>Id.</u>, p. 138.) At this point, Ms. Young stated that she asked the bartender to bring Petitioner a coffee. (<u>Id.</u>) As Petitioner was drinking his coffee, Ms. Young stated that she was talking about leaving and Petitioner also stated that he was going home. (<u>Id.</u>, p. 139.) Ms. Young stated that she then asked Petitioner if he was okay to drive, and she offered him a ride. (<u>Id.</u>, p. 140.) Ms. Young acknowledged that Petitioner was "a nice person" at that point in the evening. (<u>Id.</u>) Ms. Young stated that she and Petitioner left the Café between 1:30 a.m. to 2:00 a.m. on September 13, 1992. (<u>Id.</u>, pp. 140-41.) Once they arrived at Petitioner's apartment, Ms. Young acknowledged that she asked if she could use his restroom. (<u>Id.</u>, p. 144.) Ms. Young explained that they entered Petitioner's apartment where she went straight to the restroom. (<u>Id.</u>, pp. 144-45.) Once Ms. Young exited the restroom, she explained that Petitioner was standing in the doorway of the living room and she followed him into the living room where she took a seat on the love seat. (<u>Id.</u>, pp. 148-49.) Ms. Young explained that Petitioner had a seat beside her and "we started holding hands and kissing and stuff and one thing led to another and we had sex." (<u>Id.</u>, p. 150-51.) Ms. Young explained that the consensual sexual encounter began in the living room where both individuals undressed and then continued into the bedroom. (<u>Id.</u>) Ms. Young explained that the parties engaged in oral sex and "regular intercourse" while in the living room. (<u>Id.</u>, p. 180.) Ms. Young stated that the consensual sexual acts lasted for approximately an "hour and a half." (<u>Id.</u>, p. 152.) Ms. Young testified that she never bit Petitioner during or after their sexual interaction. (<u>Id.</u>, pp. 152 and 196.)

Once their consensual sexual encounter had concluded, Ms. Young explained that she exited the bedroom and entered the living room to get a cigarette from her purse. (Id., p. 152.) Ms. Young explained that her purse and all of her clothing were in the living room. (Id.) Ms. Young also stated that she asked Petitioner for a glass of water and told him she "needed to go home because [she] needed to let [her] dogs out." (Id., p. 153.) During this time, Ms. Young stated that Petitioner asked her several times to "just stay," but Ms. Young consistently told him she needed to leave to let her dogs out. (Id., pp. 153-54.) Ms. Young stated that when she picked up part of her clothes, Petitioner "started coming up against [her] and was, like, please don't go; and he was, like, pushing his body up against [her] and [she] just kept backing away and [she] told him [she] really needed to go home." (Id., p. 154.) Ms. Young explained that Petitioner just kept coming at her, pushing his body up against her, until she backed up and fell into a chair in the living room. (Id.) Ms. Young testified that she became fearful of Petitioner at this point because "something about him changed." (Id., pp. 154-55.) Ms. Young explained the "change" in Petitioner as follows:

> Everything. His whole, I guess, persona. He - - I felt threatened. He didn't seem - - he had seemed very gentle and kind. When we had had sex he wasn't rough. He was very gentle and very nice. Not at any point even, like rough, aggressive, nothing like that. And he just was, like, getting aggressive and it was scaring me.

(Id., p. 155.) Ms. Young stated that she had done nothing to cause the change other than stating that she wanted to go home. (Id., pp. 155 and 195.) Ms. Young explained that once she fell back into the chair, Petitioner "sat down on the edge of the chair and leaned over [her] . . . just, like, trying to hold [her] in the chair." (Id., p. 156.) Ms. Young explained that she felt "very threatened at that point" and she "asked him to please stop that he was scaring [her] and then he hit [her]." (Id., pp. 157-58.) Ms. Young explained that Petitioner hit her in the face with an open hand with

19

such force that it turned her head. (Id., p. 158.) Ms. Young explained that after she was hit, she "was scared to death. [She] just wanted to go home." (Id.) Ms. Young stated that Petitioner then "asked if [she] was afraid and [she] said, 'Yes,' and he said, 'Good, I want you to be afraid." (Id.) Ms. Young testified that Petitioner then forced her perform oral sex upon him by grabbing her by the hair of her head and shoving his private parts towards her face. (Id., pp. 158-59.) Ms. Young stated that Petitioner had an erection at this time and asked her "if [she] sucked better dick when [she] was afraid." (Id., p. 159.) Ms. Young testified that Petitioner "kept asking me that." (Id.) Ms. Young verified that she performed oral sex upon Petitioner, but he did not ejaculate. (Id., p. 160.) Ms. Young explained that the foregoing events lasted about twenty minutes and he then forced her to the bedroom. (Id., p. 160-62.) Ms. Young testified that Petitioner pushed her down on the bed and climbed on top of her. (Id., pp. 162-63.) Ms. Young again stated that Petitioner was continuing to ask her if she was afraid, and she continuous told him "yes . . . please just let me go." (Id., p. 163.) Ms. Young stated that Petitioner "kept smiling when [she] would say [she] was afraid" and "[h]e seemed to enjoy that [she] was afraid." (Id., pp. 164-65, and 195.) Ms. Young explained that when Petitioner was getting into a position to try to make her perform oral sex again, she kicked him and ducked under his arm and ran to the door of the bedroom. (Id., p. 166.) Ms. Young stated that she ran towards the fire escape naked and yelling for help. (Id.) Ms. Young explained that Petitioner was running right behind her and tackled her as she hit the doorway to go outside. (Id., p. 167.) Ms. Young stated that after she fell, she was able to kick away from Petitioner and run to the next-door neighbor's door where she banged on the door and fell again. (Id., p. 167-68.) Ms. Young explained that when she fell the second time, Petitioner grabbed her again and "pulled his weight up [her] body until he got [her] hair and then he, like,

kept bending [her] bead back, like, trying to drag [her] back into the apartment." (Id., p. 168.) Ms. Young stated that in response she started hitting and kicking at him and then she just grabbed the handrail to try to prevent him from dragging her back into the apartment. (Id., pp. 168 and 186.) Ms. Young further stated that Petitioner was kicking at her. (Id., p. 186.) Ms. Young testified that she had some bruising to her arm, face, and back. (Id., p. 169.) Ms. Young explains she was finally able to get away when the downstairs neighbor yelled something like "What is going on up there?" and "as soon as she screamed it startled him and he jumped." (Id., p. 169-70.) Ms. Young testified that when Petitioner jumped, he hit his head on an air conditioning unit that was sticking out and it seemed to almost stagger him. (Id., p. 170.) Ms. Young explained that she then ran downstairs to the neighbor and the neighbor's boyfriend came out and wrapped a sheet around her. (Id.) Ms. Young stated that the neighbor asked if she had been raped and she responded "yes." (Id.) Ms. Young explained that the police were called and she was taken to the hospital by an ambulance. (Id.)

Ms. Young testified that she was transported to the Cabell-Huntington Hospital where she was evaluated by a doctor. (Id., p. 171.) Ms. Young explained that she informed hospital staff about injuries to her face and nose. (Id., p. 188.) Ms. Young stated that she told hospital staff that her nose was broken, but she refused x-rays because she had a broken nose in the past and "they can't do anything for it . . . and [she] just wanted to go home." (Id., pp. 171 and 188.) Ms. Young stated that she also pointed out redness or bruising to her arm. (Id., p. 189.) Ms. Young explained that the doctor was only in the exam room for approximately three minutes and that she mostly "talked with the nurse and the police officer." (Id., p. 190.) Ms. Young further acknowledged that she was interviewed by Detective Ball while at the hospital. (Id., p. 171.) Ms. Young testified

21

that she refused an oral rape kit. (Id., p. 172.) Ms. Young explained that she refused the rape kit because the rape counselor, Detective Ball, and the doctor explained that the rape kit "wouldn't do any good" because there had been consensual oral sex prior to the rape. (Id., pp. 172 and 193.) Ms. Young further testified that she only discussed possible battery charges against Petitioner because she wanted to avoid getting on the stand and testifying as to forgoing. (Id., p. 203.)

Ginger Mascair testified that she lived in the same apartment complex as Petitioner on September 13, 1992. (Id., p. 208.) Ms. Mascair explained that her past employment included the United States Navy where she was a hospital corpsman, paramedic, EMT, and basic cardiac care. (Id.) As part of her EMT experience, Ms. Mascair explained that she would often deal with spousal abuse. (Id., pp. 209-11.) On September 13, 1992, Ms. Mascair explained that she was in her bedroom and heard a loud thump that "sounded like a bowling ball or something heavy hitting the floor." (Id., pp. 213, 230.) Ms. Mascair stated that when she heard the loud thump, she proceeded to her roommate's room and "walked out the back door, which is part of Stephanie's room." (Id., p. 213.) Ms. Mascair explained that she heard someone yelling, "Please, somebody help me. Help me! Call 911." (Id.) Ms. Mascair stated that "as I walked out onto the cat-walk, which is right outside the door, I looked up over the cat-walk to look above me and there was a young lady running down the cat-walk screaming, 'Help me! Somebody help me!'" (Id.) Ms. Mascair explained that she told Ms. Young to "come down here" and "she ran down to our part on our cat-walk from the third floor to the second floor cat-walk and she had no clothes on and came directly down to our apartment." (Id., pp. 213-14.) Ms. Mascair, however, acknowledged that she did not see Petitioner tackle Ms. Young nor did she see Ms. Young holding to the rails to prevent herself from being drugged back into Petitioner's apartment. (Id., p. 232.) Ms. Mascair

described Ms. Young as follows: "She was extremely frantic. She was scared. She was crying. She was having problems at that time evening talking straight. She was extremely disoriented and basically was just scared." (Id., p. 215.) Ms. Mascair explained that she took Ms. Young into the apartment, where they covered her with a sheet, and Ms. Young stated that she had been raped. (Id.) Ms. Mascair stated that her roommate called 911 reporting a possible rape. (Id., pp. 215-16.) Ms. Mascair verified that Ms. Young did not go into any details about the rape and only went into vague detail about being hit. (Id., p. 216.) Ms. Mascair testified that while her roommate was calling 911, she heard something on the cat-walk and she walked outside. (Id., pp. 231-32.) Ms. Mascair testified that Petitioner was leaning over the cat-walk and yelled "You can come and get your f**king clothes, you f**king whore." (Id.) Ms. Mascair stated that police arrived within approximately 10 minutes and the paramedics arrived in approximately 20 minutes after the 911 call. (Id., p. 217.) Ms. Mascair testified that Ms. Young told her that her and Petitioner had met at the Calamity Café, she had come up to Petitioner's apartment, the two engaged in sexual activity, and when she decided to leave the Petitioner's personality changed and he forced her to do things she did not want to do. (Id., pp. 218-19.) Ms. Mascair testified that she noticed a "large red mark" on Ms. Young's face and "large red whelp-like marks on her back, on her shoulders." (Id., p. 220.) Ms. Mascair testified that she talked to the police on the night of the incident and then she gave a taped statement to Detective Ball. (Id., pp. 222-23.) Ms. Mascair verified that her taped statement was transcribed, and she verified the accuracy of the typed statement. (Id., p. 224-27.) Ms. Mascair explained that in her statement to Detective Ball, she did not state that Ms. Young told her she had been raped because "he never asked me if she was raped." (Id., pp. 241 and 243.)

The State rested its case and Petitioner called Dr. Alfred Baldera, John Rameo, and Detective David Ball as defense witnesses. (Document No. 88-21, pp. 11-12, 31, 37.)

Dr. Alfred Baldera testified that he worked in the Emergency Department at the Cabell-Huntington Hospital. (Id., pp. 12-13.) Dr. Baldera testified that he examined Kathy Young in the ER during the early morning hours of September 13, 1992. (Id., p. 14.) Dr. Baldera stated that Ms. Young claimed she had been sexually assaulted and struck in the face. (Id., p. 15.) Dr. Baldera indicated that Ms. Young's history was taken by the triage nurse and her history did not indicate her scalp being tender or any other injuries to her body. (Id.) Dr. Baldera testified that he examined Ms. Young and she had contusions on her face and nose. (Id., pp. 15-16, 24.) Dr. Baldera, however, acknowledged that he did not examine Ms. Young's whole body. (Id., pp. 20-21.) Dr. Baldera explained that his examination was limited to her face, arms, and "things that were visible on the surface." (Id., p. 21.) Dr. Baldrea acknowledged that he could not recall if he examined Ms. Young's back. (Id.) Dr. Baldera described that Ms. Young had a mild contusion on the right side of her face and there was redness and tenderness of the nose. (Id., p. 16.) Dr. Baldera affirmed that he requested an x-ray of Ms. Young's nose, but she declined the x-ray. (Id., pp. 16-17.) Dr. Baldera acknowledged that he examined her nose from a clinical standpoint and found no break. (Id., p. 17.) Dr. Baldera, however, explained "that's gross judgment as far as the nose is concerned. That is no accurate judgment there." (Id.) Dr. Baldera stated that he discussed performing a rape kit with Ms. Young, but she declined the test. (Id., pp. 18-19.) Dr. Baldera explained that Ms. Young did not give him a reason for refusing the rape test – "[s]he simply refused it." (Id., p. 19.) Dr. Baldera further stated that he never advised Ms. Young to refuse the rape test. (Id., pp. 19 – 22.) Dr. Baldera explained that information concerning an alleged sexual

assault is usually done by the police, and he had no record of any information concerning the details of the alleged sexual assault involving Ms. Young. (Id., pp. 21-22) Finally, Dr. Baldera explained that Ms. Young was crying when she first arrived at the ER, but by the time he examined Ms. Young, she appeared "somewhat angry." (Id., p. 28.) Dr. Baldera stated that rape victims can "go through the gambit of emotion," but Ms. Young "seemed to be more angry at us rather than at anyone else." (Id.)

John Rameo testified that he was returning his apartment on September 13, 1992, between 3:00 a.m. and 4:00 when he heard loud voices coming from the area of Petitioner's apartment. (Id., pp. 32-33.) Mr. Rameo explained he heard a loud male voice yelling "Get back in here and get your clothes on," or "Get out here and - - get your clothes on and get out of here." (Id., p. 34.) Mr. Rameo denied hearing a female voice and stated he had no visual contact with the area of the voice. (Id., pp. 34-35.) Mr. Rameo acknowledged that there could have possibly been shouting prior to the male voice, which he did not hear. (Id., p. 37.)

Detective David Ball testified that in the early morning hours of September 13, 1992, he was called out the Cabell-Huntington Hospital to investigate an alleged sexual assault of Ms. Young. (Id., p. 38.) Detective Ball explained that upon arriving at the hospital, he was briefed by Officer Williams. (Id., p. 39.) Detective Ball stated that Officer John Williams was one of several officers that had first responded to the apartment complex following the 911 call, and Officer Williams followed the victim to the hospital. (Id., p. 41.) Detective Ball stated that the 911 call came in at 4:15 a.m. on September 13, 1992. (Id., p. 40.) Detective Ball explained that he took a rape kit with him to the hospital, which is standard practice. (Id., p. 42.) Detective Ball testified that "[t]he rape kit is provided for vaginal swabbing, oral swabbing, the gathering of pubic hair,

fingernail scrapings, all of which is to assist in identifying a suspect." (<u>Id.</u>) Detective Ball stated that he had an opportunity to talk to the victim for approximately 20 minutes and the victim's mother and a rape counselor was also present. (<u>Id.</u>) Detective Ball stated that Ms. Young "was wearing a hospital gown and was pretty visibly shaken," but he "did not do an examination of anything other than the face and shoulders maybe." (<u>Id.</u>, pp. 43-44.) Detective Ball explained that he could see what appeared to be a definite red mark on Ms. Young's right cheek and redness around her nose. (<u>Id.</u>) Detective Ball stated that Ms. Young appeared to be "visibly shaken" and "appeared very sober." (<u>Id.</u>, p. 44.) Detective Ball testified that Ms. Young indicated that her nose and face was giving her considerable pain and she had a headache. (<u>Id.</u>, pp. 45 - 46.) Detective Ball acknowledged that he did not hear Ms. Young complain of any injuries to her back or abdomen. (<u>Id.</u>) Concerning the performance of the rape kit, Detective Ball testified as follows:

> I told the doctor that she did not want to go through the embarrassment of the rape kit. She had already admitted that there was consensual sex possibly to the point of ejaculation. She had also stated that there was oral copulation and at that point we did not need physical evidence to gain an identity of a suspect. We had a suspect.

(<u>Id.</u>, p. 47.) Detective Ball acknowledged that Ms. Young informed him that she was tackled as she exited Petitioner's apartment onto the catwalk. (<u>Id.</u>, p. 67.) Detective Ball explained that after talking to Ms. Young, he thought "there was definitely probable cause to interview [Petitioner.]" (<u>Id.</u>, p. 51.) Detective Ball further explained that after he informed Ms. Young that she would be required to testify as to facts of the sexual assault and "it was not going to be a pleasant experience but a necessary one," Ms. Young inquired as to whether battery charges could be filed against Petitioner. (<u>Id.</u>, pp. 52, 69-70.) Detective Ball testified that he explained to Ms. Young

that "the same things would take place in a misdemeanor battery and the same facts revealed, the same line of questioning" and "If you are going to subject yourself to the same nature of questioning and embarrassment, then you go with the rape case." (Id.) Detective Ball explained that Ms. Young indicated her concern and embarrassment as follows: "I had sex with him willingly up to that point . . . How can I get across to anyone that at some point it was against my will and that it was a violent act." (Id., p. 71.) Detective Ball acknowledged that Ms. Young had expressed from the very beginning of his interview that she wanted to go home, which is consistent with a rape victim. (Id., p. 76.) Detective Ball acknowledged that Ms. Young indicated that the relationship with Petitioner turned violated when she indicated that she wanted to go home. (Id., p. 77.) Detective Ball testified that Ms. Young indicated that the more scared she got, the more thrilled Petitioner got. (Id., p. 78.) Detective Ball stated that Ms. Young explained that Petitioner forced his body next to her face and repeatedly asked her if she was afraid, and inquired whether she performed better oral sex when she was afraid. (Id., p. 79.) Detective Ball testified that Ms. Young explained that Petitioner then forced her into the bedroom, where she was eventually able to escape to the rear exit. (Id., pp. 80-83.)

Detective Ball testified that Petitioner was taken into custody on the night of the incident, and he interviewed Petitioner at approximately 6:00 a.m. (Id., p. 54.) Detective Ball explained that he interviewed Petitioner for approximately 20 minutes, enough time for Petitioner to write out a statement. (Id., p. 55.) Detective Ball stated that Petitioner signed a voluntary waiver of his rights without any refusal or hesitation. (Id., pp. 56 - 57.) Detective Ball explained that he informed Petitioner of Ms. Young's allegations and asked Petitioner "his side of the story." (Id., p. 58.) Detective Ball testified that Petitioner wrote the following statement:

I came home with a girl I met at Calamity Café. She said her name was Gina. We

27

> made love . . . In the living room and my bedroom. We enjoyed one another's
> company, but at one point she bit me . . . I got mad and slapped her. She pushed
> me away and ran outside. She had bitten my shoulder . . . I followed her outside
> and told her to get her clothes and leave. But, she screamed "F\*\*k you, get away,"
> and ran down the steps. I talked with the neighbor (we had woke him up) . . . he
> told me to go find her or I might get in trouble . . . But, I went back to the living
> room and went to sleep. I was on the couch when the officers woke me up . . .

(Id., p. 60.) Detective Ball stated that Petitioner indicated he and Ms. Young had engaged in

consensual oral sex. (Id., p. 68.) Detective Ball testified that Petitioner "pulled his shirt down and

stated that he had been bitten and he did have a red mark on his chest." (Id., p. 61.) Detective

Ball acknowledged that he decided that he was not going to file any charges at that time and he

took Petitioner home. (Id.) Detective Ball further acknowledged that Petitioner signed a "release

of claims," which is a "stipulation that they agree not to sue any of the officers for having him in

custody for questioning at that time." (Id., pp. 64 - 65.)

## THE APPLICABLE STANDARDS

Federal *habeas* relief is available to a State prisoner under 28 U.S.C. § 2254, only if the

prisoner "is in custody in violation of the Constitution or laws or treaties of the United States."

28 U.S.C. § 2254(a)(2002); See also Sargent v. Waters, 71 F.3d 158, 160 (4th Cir. 1995). Section

2254(d) provides that when the issues raised in a Section 2254 Petition were raised and

considered on the merits in State Court *habeas* proceedings, federal *habeas* relief is unavailable

unless the State Court's decision:

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the State court proceeding.

To trigger the above AEDPA deference, a State Court's decisions must be "adjudicated on the

merits." <u>Gordon v. Braxton</u>, 780 F.3d 196, 202 (4th Cir. 2015)(If the State court's decision does not qualify as an "adjudication on the merits," AEDPA deference is not triggered and the Court must review the issue *de novo*.). A claim is "adjudicated on the merits" if the claim "is exhausted in state court and not procedurally defaulted." <u>Gray v. Zook</u>, 806 F.3d 783, 798 (4th Cir. 2015)(citation omitted); <u>also see</u> <u>Thomas v. Davis</u>, 192 F.3d 445, 455 (4th Cir. 1999)(explaining that a claim has been adjudicated upon the merits where the claim was "substantively reviewed and finally determined as evidenced by the state court's issuance of a formal judgment or decree"); <u>Matthews v. Evatt</u>, 105 F.3d 907, 911 (4th Cir. 1997), *abrogation on other grounds recognized*, <u>United States v. Barnett</u>, 644 F.3d 192 (4th Cir. 2011)(Exhaustion requires that a claim be "fairly presented," such that the claim was presented face-up and squarely, providing an opportunity for review by the highest state court.) It is a case-specific inquiry as to whether a claim has been "adjudicated on the merits," but a "claim is not 'adjudicated on the merits' when the state court makes its decision 'on a materially incomplete record.'" <u>Braxton</u>, 780 F.3d at 202 (citing <u>Winston v. Kelly (Winston I)</u>, 592 F.3d 535, 544 (4th Cir. 2010)(The record may be materially incomplete if a state court "unreasonably refuses to permit further development of the facts.") The Fourth Circuit has explained that where a state court "unreasonably refuses to permit further develop of the facts," it passes up the opportunity that exhaustion ensures. <u>Winston v. Pearson (Winston II)</u>, 683 F.3d 489, 496 (4th Cir. 2012)(exhaustion requires that a state court have an opportunity to apply the law and consider all relevant evidence to petitioner's claim). Additionally, the "adjudication on the merits" requirement does not exclude "claims that were decided in state court, albeit in a summary fashion." <u>Thomas v. Taylor</u>, 170 F.3d 466, 475 (4th Cir. 1999); <u>also see</u> <u>Winton II</u>, 683 F.3d at 502(discussing <u>Harrington v. Richter</u>, 562 U.S 86, 131

S.Ct. 770, 178 L.Ed.2d 624 (2011)(noting that although a state court's summary denial may be presumed an "adjudication on the merits," a federal court may still find that the state court did not adjudicate a claim on the merits if the thoroughness of the state court's development of the record is challenged and there was a materially incomplete record before the state court.) When a state court summarily rejects a claim and does not set forth its reasoning, the federal court independently reviews the record and clearly established Supreme Court law. Bell v. Jarvis, 236 F.3d 149 (4th Cir.), cert. denied, 524 U.S. 830, 122 S.Ct. 74, 151 L.Ed.2d 39 (2001). The Court, however, must still "confine [it's] review to whether the court's determination 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" Id. at 158; also see Harrington, 562 U.S at 98 – 99, 131 S.Ct. at 770("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief. This is so whether or not the state court reveals which of the elements in a multipart claim it found insufficient, for § 2254(d) applies when a 'claim,' not a component of one, has been adjudicated.").

In Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the Supreme Court stated that under the "contrary to" clause in § 2254(d)(1), a federal *habeas* Court may grant *habeas* relief "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412-13, 120 S.Ct. at 1523. A federal *habeas* Court may grant relief under the "unreasonable application" clause of § 2254(d)(1) where the State Court identified the appropriate Supreme Court precedent but

unreasonably applied the governing principles. Id.(A "federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."); also see Woods v. Donald, 575 U.S. ___, 135 S.Ct. 1372, 191 L.Ed.2d 464 (2015)(per curiam)(For a state court's decision to be an unreasonable application of clearly established federal law, the ruling must be "objectively unreasonable, not merely wrong; even clear error will not suffice.") Thus, a litigant must "show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 562 U.S at 103, 131 S.Ct. at 770. When a petitioner challenges the factual determination made by the State Court, "federal habeas relief is available only if the state court's decision to deny post-conviction relief was 'based on an unreasonable determination of the fact.'" 28 U.S.C. § 2254(d)(2). In reviewing a State Court's ruling on post-conviction relief, "we are mindful that 'a determination on a factual issue made by the State court shall be presumed correct,' and the burden is on the petitioner to rebut this presumption 'by clear and convincing evidence.'" Tucker v. Ozmint, 350 F.3d 433, 439 (4th Cir. 2003); also see 28 U.S.C. § 2254(e).[6] On this framework, consideration should be

---

[6] Title 28, U.S.C. Section 2254(e) provides:

   (e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

   (2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –
      (A) the claim relies on –
         (I) a new rule of constitutional law, made retroactive to cases on

given to the Motions for Summary Judgment.

**Motion for Summary Judgment:**

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Once the moving party demonstrates the lack of evidence to support the non-moving party's claims, the non-moving party must go beyond the pleadings and make a sufficient showing of facts presenting a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 - 87, 106 S.Ct.1348, 89 L.Ed.2d 538 (1986). All inferences must be drawn from the underlying facts in the light most favorable to the non-moving party. Matsushita, 475 U.S. at 587, 106 S.Ct. at 1356. Summary judgment is required when a party fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual issues proving other elements of the claim. Celotex, 477 U.S. at 322-23, 106 S.Ct. at 2552-53. Generally speaking, therefore, summary judgment will be granted unless a reasonable jury could return a verdict for the non-moving party on the evidence presented. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If no facts or inferences which can be drawn from the circumstances will support non-moving party's claims, summary judgment is appropriate.

---

collateral review by the Supreme Court, that was previously unavailable; or
(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

## ANALYSIS

**1.     Appellate delay resulted in a violation of due process:**

The undersigned notes that Petitioner asserted the above claim in his Motion for Partial Summary Judgment. (Document No. 85.) For the reasons fully explained within the undersigned's Proposed Findings and Recommendation entered on July 20, 2018 (Document No. 98), the undersigned finds that Petitioner's above claim is without merit and should be dismissed.

**2.     Trial court improperly coerced the jury:**

In his Petition, Petitioner argues that "[b]ecause the jurors at my trial were subjected to judicial coercion, my conviction was obtained in violation of the due process provisions of the Fourteenth Amendment of the United States Constitution." (Document No. 1, pp. 18 – 19.) Petitioner explains that "at the conclusion of voir dire, the court's attention was directed to the problems that might arise if two of the prospective jurors were actually required to serve as members of the jury." (Id., p. 18.) Petitioner states that his trial was expected to last at least into Thursday, and Prospective Jurors Angela Adams and Earl Perry notified the trial court that they had "important commitments for the coming Friday." (Id.) Petitioner complains that although the Court could have excused Jurors Adams and Perry, the trial court declined to do so stating the following: "We will stay Thursday. We will get finished. We will stay late if we have to to get finished." (Id.) Petitioner explains that Jurors Adams and Perry became members of his jury. (Id.) Petitioner complains that "all of the jurors knew about the prior commitments of Adams and Perry and about the court's desire for a two-day trial." (Id.) Plaintiff asserts that throughout the trial, the trial court continuously reminded the jurors and the attorneys of its desire for the trial to concluded by Thursday. (Id., pp. 18 – 19.) Petitioner contends that after two and a half hours of

deliberations, the Foreperson Adams reported that the jurors were deadlock at "six-four-two." (Id., p. 19.) Petitioner complains that the trial court instructed the jurors to return to the jury room and "discuss it again and see whether or not you all feel as a group that you can continue to deliberate and possible arrive at a verdict." (Id.) Petitioner states that although the trial court emphasized the jurors' duty to agree upon a verdict, the trial court failed to explain the duty of reasonable dissent. (Id.) Petitioner asserts that after 40 minutes of further deliberation, the jurors returned a guilty verdict. (Id.)

In his Motion for Summary Judgment, Respondent argues "Petitioner's conviction for second degree sexual assault was rendered by a fair and impartial jury." (Document No. 91, pp. 16 – 17.) Respondent states that Petitioner's "claim arises solely out of the circuit court instructing the jury to continue deliberations when the jury informed the court they were deadlocked after deliberating for only two and a half hours." (Id., p. 16.) Citing Allen v. United States, 164 U.S. 492, 501 (1896), Respondent argues that a trial court's discretion to instruct the jury to continue deliberations has been permissible since 1896. (Id., p. 17.) Respondent contends that the WVSCA considered and denied Petitioner's above claim and such "should be given deference pursuant to 28 U.S.C. § 2254." (Id., p. 16.) Respondent asserts "there is nothing in the record to refute the WVSCA's findings." (Id.)

In Response, Petitioner first argues that the above claim is subject to de novo review. (Document No. 97, pp. 10 – 11.) Petitioner argues that in asserting the above claim before the WVSCA, he failed to specifically reference a federal constitutional violation. (Id.) Therefore, Petitioner states that this claim was not "fairly presented" to the State courts. (Id.) Next, Petitioner argues that this Court should find that the trial court's "coercive remarks and

instructions resulted in a violation of Petitioner's right to due process." (Id., pp. 13 – 17.) Petitioner contends that by the conclusion of voir dire all of the jurors were "well aware of the court's desire for a two-day trial" and jurors "are inclined to comply with the court's desires." (Id., p. 13.) Thus, Petitioner argues that Petitioner's trial possessed a coercive atmosphere from the start. (Id., p. 14.) Petitioner again contends that the trial court continuously reminded the juror and the attorneys of its desire of a two-day trial. (Id.) Petitioner contends that the worst of the reminders occurred Thursday morning when the trial "court stated to the jurors, 'We have got to finish this case today,' and then threatened Adams and Perry with the possibility of overnight incarceration." (Id.) Petitioner argues that "[w]ith its gratuitous reminders and threatening remarks, the court pressured the jurors to be expeditious rather than thoughtful." (Id.) Petitioner asserts that "performing their duties expeditiously was the only option available to the jurors – the only means of insuring that the court was never tempted to adjourn for the evening and carry out its threat." (Id.) Petitioner further notes that prior to deliberations, as part of its charge to the jury, the trial court delivered a unanimity instruction modeled upon the one upheld in State v. Taft, 110 S.E.2d 727 (1959). (Id., p. 15.) Petitioner complains that unlike the instruction given in Taft, the trial court's instruction failed to explain the duty of reasonable dissent. (Id.) Specifically, Petitioner explains that the instruction omitted "the standard admonition that agreement should only be reached without a sacrifice of conscientious convictions and does not otherwise seek to convey that 'reasoned opinions and firm convictions thoughtfully reached should not be abandoned.'" (Id.) Finally, Petitioner argues that the trial court improperly instructed the jurors to continue their deliberations after the jurors notified the trial court of a deadlock. (Id., pp. 15 -16.) Despite the fact that only three jurors indicated that continued

deliberation might be helpful, Petitioner complains that the trial court instructed the jurors to continue their deliberations. (Id.) Petitioner argues that for the nine jurors, who failed to raise their hand indicating that additional deliberation could be helpful, the trial court's remarks constituted rebuke implying that "some of them were disregarding its previous instruction and using 'pride or stubbornness.'" (Id., p. 16.) Petitioner notes that in its supplemental charge, the trial court again improperly failed to explain the duty of reasonable dissent. (Id.)

Based upon the foregoing, the undersigned finds that Petitioner appears to argue that the trial court violated his right to due process in two ways: (1) By continuously reminding the jury of time restraints and forcing deliberations to continuing resulting in a coerced verdict; and (2) By giving a coercive *Allen* charge. The undersigned will consider each argument in turn.

A.     **Time restraints and forced deliberations:**

First, Petitioner argues that this claim is unexhausted and should be considered de novo because the claim was not "fairly presented" to the WVSCA. "A claim is fairly presented when the petitioner presented to the state courts the substance of his federal habeas corpus claim. The ground relied upon must be presented face-up and squarely; the federal question must be plainly defined." Matthews v. Evatt, 105 F.3d 907, 911 (4th Cir. 1997), *abrogation on other grounds recognized*, United States v. Barnett, 644 F.3d 192 (4th Cir. 2011). Petitioner must provide the state court with the facts supporting the claimed constitutional violation and "explain how those alleged events establish a violation of his constitutional rights." Mallory v. Smith, 27 F.3d 991, 994 (4th Cir. 1994). Although Petitioner argues that he did not assert his federal due process claim in the WVSCA, a thorough review of the record reveals otherwise. In his federal Petition, Petitioner argues that the trial court violated his right to due process by continuously reminding

36

the jury of time restraints and forcing deliberations to continuing resulting in a coerced verdict. In his Response in Opposition to Respondent's Motion for Summary Judgment, Petitioner makes nearly identical arguments as those asserted in his brief filed with the WVSCA. (Document No. 58-60, pp. 28 – 29 and Document No. 97, pp. 14 – 15.) Despite Petitioner's argument that his federal claim was not presented to the WVSCA, Petitioner cites the same authority in support of his federal claim: Burroughs v. United States, 365 F.2d 431 (10th Cir. 1966); State v. Spence, 313 S.Ed.2d 461 (W.Va. 1984); and State v. Jones, 234 S.E.2d 555 (N.C. 1977). (Id.) Thus, the undersigned finds that Petitioner's above claim was "fairly presented" to the WVSCA. Although the WVSCA denied the claim in summary fashion, such a claim is still considered an "adjudication on the merits." See Thomas, 170 F.3d at 475. When a state court summarily rejects a claim and does not set forth its reasoning, the federal court independently reviews the record and clearly established Supreme Court law. Bell v. Jarvis, 236 F.3d at 149. The Court, however, must still "confine [it's] review to whether the court's determination 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" Id. at 158; also see Harrington, 562 U.S at 98 – 99, 131 S.Ct. at 770. The undersigned, therefore, will review Petitioner's time restraint and forced deliberation claim under AEDPA's deferential standard.

The undersigned finds that Petitioner's above claim is without merit because there is no evidence that the WVSCA's determination was contrary to, or an unreasonable application of, clearly established federal law; or based on an unreasonable determination of facts. As stated above, *habeas* relief under Section 2254(d)(1) shall not be "granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . .

resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, *as determined by the Supreme Court of the United States*."  28 U.S.C. 2254(d)(1)(emphasis added). The Supreme Court has stated that "'[c]learly established Federal law' . . . includes only 'the holdings, as opposed to the dicta, of this Court's decisions.'" Howes v. Fields, 565 U.S. ___, 132 S.Ct. 1181, 182 L.Ed.2d 17 (2012)(citation omitted). The Supreme Court has further explained that "[i]f this Court has not broken sufficient legal ground to establish an asked-for constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar." Williams v. Taylor, 529 U.S. 362, 381, 120 S.Ct. 1495, 1506-07, 146 L.Ed.2d 389 (2000). A criminal defendant being tried by a jury is clearly entitled to an uncoerced verdict. Lowenfield v. Phelps, 484 U.S. 231, 241, 108 S.Ct. 546, 554, 98 L.Ed.2d 569 (1988). Although Petitioner clearly had a right to an uncoerced verdict, Petitioner fails to explain how the WVSCA decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." Specifically, the undersigned cannot find that the WVSCA arrived at a conclusion opposite to that reached by the United States Supreme Court on a question of law, or that the WVSCA decided Petitioner's case differently than the United States Supreme Court has on a set of materially indistinguishable facts. See Williams, 529 U.S. at 412-13, 120 S.Ct. at 1523.

To the extent Petitioner is challenging the WVSCA's factual determination, his claim is without merit. When a petitioner challenges the factual determination made by the State Court, "federal habeas relief is available only if the state court's decision to deny post-conviction relief was 'based on an unreasonable determination of the fact.'" 28 U.S.C. § 2254(d)(2). The WVSCA

found, in pertinent part, as follows:

> The circuit court's expression to the jury of its desire to finish the trial in two days was couched in a conversational and polite tone, which did not coerce the jury into prematurely convicting petitioner. Nor did the trial judge rush the jury into convicting petitioner by commenting to it that he would hate to have to put them in jail overnight to make sure that they would be there the next day. The comments made by the circuit court, in this regard, were not threats, but were clearly said in jest.

(Document No. 88-13, pp. 7 – 8.) As stated above, a State court's factual determinations are presumed correct and the burden is on petitioner to rebut this presumption by clear and convicting evidence. Tucker, 350 F.3d at 439. Petitioner's conclusory argument that the trial court's "gratuitous reminders and threatening remarks . . . pressured the jurors to be expeditious rather than thoughtful" is insufficient. The record fails to support Petitioner's claim that the trial court "threatened Adams and Perry with the possibility of overnight incarceration." A review of the record reveals that during voir dire, the trial court informed the prospective jurors that the trial was expected to last two days. (Document No. 88-20, pp. 33, 49-52.) In response, Jurors Adams and Perry notified the trial court that each had significant commitments for the coming Friday (which would have been day three of the jury trial). (Id.) The trial court, however, found it unnecessary to excuse Jurors Adams and Perry. (Id., p. 78.) During a bench conference, the trial court informed counsel as follows: "We will stay Thursday. We will get finished. We will stay late if we have to get finished." (Id.) Both Jurors Adams and Perry became members of Petitioner's jury. A thorough review the record does not support Petitioner's contention that trial trail coerced the jury by threatening jurors with overnight incarceration. The record reveals that following the State's cross-examination of Petitioner's defense witness (Detective Ball), the trial court stated as follows:

> We are going to - - I have talked to the lawyers. We have got to finish this case

39

today because a couple of you have got commitments tomorrow. So we are getting along pretty good but I don't have any idea how may more witnesses there are. But you all plan to stay here until we get finished tonight. A couple of you said you may not be able to come back tomorrow. I would hate to put you in jail. We would hate to have to keep you over there all night to make sure you are here tomorrow, you know. We haven't done that very often.

(Document No. 88-21, pp. 87 – 88.) Viewing the record as a whole, the undersigned cannot find that the WVSCA's factual determination that the trial court's statements were made in jest, and not as threats, was unreasonable. Further, the record supports the WVSCA's determination that the trial court's continuous reminder of its desire to finish the trial in two days "was couched in a conversational and polite tone" and not coercive. Based on the foregoing, the undersigned finds that the State court's determination on the above claim was not contrary to, or an unreasonable application of, clearly established federal law; or based on an unreasonable determination of the facts. Accordingly, the undersigned respectfully recommends that Respondent's Motion for Summary Judgment be granted as to the above ground.

## B.    *Allen* Charge.

Next, Petitioner argues that the trial court violated his due process rights by giving a coercive *Allen* charge. Although Petitioner challenged the same jury instruction in his direct appeal, the WVSCA failed to address the merits of Petitioner's claim. Specifically, the WVSCA determined that Petitioner's failed to object to the instruction and thereby waived the claim. (Document No. 88-13, pp. 7 – 8.) Analyzing the above claim under the "plain error" standard, the WVSCA determined trial counsel's failure to raise the objection to the trial court's instruction did not amount to plain error. (Id.) Where a defendant fails to make a proper, contemporaneous objection at trial and thus can secure at most a plain error review on direct appeal, this Court is "procedurally barred from considering the claim, unless [that defendant] can show cause and

40

prejudice for his failure to preserve the issue by a timely objection." Daniels v. Lee, 316 F.3d 477, 487 (4th Cir. 2003), cert. denied, 540 U.S. 851, 124 S.Ct. 137, 157 L.Ed.2d 93 (2003). The Fourth Circuit has recognized that "procedural default is excusable under the cause and prejudice standard when the petitioner demonstrates (1) that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule, and (2) that errors at his trial . . . worked to his *actual* and substantial disadvantage, infecting his entire trial with errors of constitutional dimensions." Wolfe v. Johnson, 565 F.3d 140, 158, n. 27 (4th Cir. 2009)(internal citations omitted). Although a claim appears to be procedurally defaulted, the court should forego further consideration of the procedural default issue if the court "can more easily dispense with the claim on its merits." Hayes, 2016 WL 5662037 at *4(citing Yeatts v. Angelone, 166 F.3d 255, 261 (4th Cir. 1999)).

In the instant case, it appears that Petitioner procedurally defaulted his above claim challenging the trial court's improper *Allen* charge. The undersigned, however, will forego further consideration of the procedural default issue and address the merits of Petitioner's claim. The undersigned finds that the record does not support Petitioner's claim that the trial court gave an improper *Allen* instruction. As stated above, a criminal defendant tried by a jury is clearly entitled to an uncoerced verdict. Lowenfield, 484 U.S. at 241, 108 S.Ct. at 554. The United States Supreme Court, however, has specifically approved the use of the "*Allen* charge." Booth-El v. Nuth, 288 F.3d 571, 580 (4th Cir. 2002). An *Allen* charge is a supplemental jury instruction "given by a court when the jury has reached an impasse in its deliberations and is unable to reach a consensus." Allen v. United States, 164 U.S. 492, 501-02, 17 S.Ct. 154, 41 L.Ed. 528 (1896). The decision to give an *Allen* charge is within the discretion of the trial court.

41

Booth-El, 288 F.3d at 580(citing United States v. Burgos, 55 F.3d 933, 935 (4th Cir. 1995)). An *Allen* charge is unconstitutional if "in its context and under all the circumstances the judge's statement" had a coercive effect on the jury. Jenkins v. United States, 380 U.S. 445, 446, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965). In determining whether an *Allen* charge is coercive, the court should consider the following:

> the charge in its entirety and in context; suggestions or threats that the jury would be kept until unanimity is reach; suggestions or commands that the jury must agree; indications that the trial court knew the numerical division of the jury; indications that the charge was directed at the minority; the length of deliberations following the charge; the total length of deliberations; whether the jury requested additional instruction; and other indications of coercion.

Tucker v. Catoe, 221 F.3d 600, 611 (4th Cir. 2000).

The record reveals that the jury retired to the jury room to deliberate at 3:36 p.m. and at 6:06 p.m. the foreperson sent a note to the trial court. (Document No. 88-21, pp. 187-88.) The trial judge notified the attorneys that as the court began to open the note, he noticed a number on it and feared the jury was going to reveal a unanimous vote and "how that vote was going." (Id., p. 188.) Therefore, the trial court advised the parties that he immediately folded the note without reading it. (Id.) The trial court informed the parties that he suspected the jury was deadlocked, but his plan was to bring the jury back into the courtroom and inquiry of the foreperson. (Id., pp. 188-89.) Upon identifying the foreperson, the trial court inquired as follows:

THE COURT:               Okay, Don't say anything. Okay? Let me just ask you some questions, but I think I know what the note was wanting to tell me; but under the law I cannot know and the attorneys cannot know - - if there is not a unanimous verdict at this time, we cannot know which way that vote is going. Okay? So don't tell me at any time.

                                     But let me ask you these questions: Has the jury arrived at a unanimous verdict at this time?

42

THE FOREPERSON:    No.

THE COURT:    Were you attempting to tell me what the vote was at this time?

THE FOREPERSON:    Yes.

THE COURT:    Okay. I saw - - I just note there was some writing at the bottom. Were you wanting some instructions or something or were you wanting to go eat or what? Or were you wanting to know what to do?

THE FOREPERSON:    We was wanting a break, yes.

THE COURT:    You were wanting a break? Okay. I will ask you at this time - - don't tell me which way the vote is going – but what is the numerical vote? Is it eight-one? Eight-two? Or whatever it is, what is the vote?

THE FOREPERSON:    Six-four-two.

THE COURT:    Six-four-two. Okay. Six-four-two. That's a new one on me. I will not try to figure that out.

Let me ask you this: Do you all feel like - - and I think we can arrange to take you all as a group to Bailey's and feed you for free. Do you feel like if we would give you all a break and let you all go up there and eat and come back that you could continue to deliberate in this case and possible arrive at a unanimous verdict?

THE FOREPERSON:    Me personally?

THE COURT:    That's what I'm asking.

THE FOREPERSON:    No.

THE COURT:    Now, you all have been out approximately two hours and a half. Are you telling me you don't feel like continued deliberations would result in a verdict in this case because of the split in the jury? I'm asking the Foreperson first. You personally

43

|                     | don't feel like continued deliberations would help in this case? |
|---------------------|------------------------------------------------------------------|
| THE FOREPERSON:     | I can't say for sure.                                            |
| THE COURT:          | Okay. Do any of the jury - - just hold up your hand if you feel this way. Do any of you feel like continued deliberations would help you in arriving at a unanimous verdict in this case? Is there anybody who feels like continued deliberations may help? |

Somebody is saying yes. One person. Two people. Three.

Let's get this straight. Just don't say anything. Do the rest of you not feel that - - you know, I have given you instructions and tell you not to use pride or stubbornness and to consider all of the evidence and change your mind if you feel like you are wrong.[7]

Two hours and a half, you haven't had too many documents or whatever to look at. You have probably had time to look at all of those.

---

[7] In its initial jury instructions, the trial court instructed the jury as follows:

Upon the trial of a criminal case by a jury the law requires the concurrence of all twelve jurors in the conclusion of guilt before a conviction can be had; each individual juror should be satisfied beyond a reasonable doubt of the guilt of the accused before he or she should consent to verdict of guilty. The Court, however, instructs the jury that the jury room is no place for pride or stubbornness and it is the duty of the jurors to discuss and consider the evidence in a spirit of fairness and candor and if possible to conscientiously agree upon a verdict. Each juror should feel the responsibility resting upon him or her as a member of the jury. However, if any juror, after having duly considered the evidence and testimony, the instructions of the Court, the arguments of counsel and after consulting with his or her fellow jurors in the spirit of fairness and candor, and with an open mind, and after having given careful consideration to the view of his or her fellow jurors, should still entertain a reasonable doubt as to the guilt of the accused, he or she is not compelled to surrender his or her own conviction, simply because all or some of the jurors entertain a different opinion.

(Document No. 88-21, pp. 111-12.)

> Let me have you all go back in and see - - let you discuss it again and see whether or not you all feel as a group that you can deliberate and possibly arrive at a verdict and when you have agreed on something, knock on the door - - ring the bell and we will bring you back out here again. Because we talked about this in orientation, you all recall. But the Court has no way to force you all into making a decision. That's improper for me to do so.
>
> Just go back in and discuss it a little bit and then buzz me and we will bring you back out.

(Id., pp. 189 - 192.) The jury retired to the jury room at 6:16 p.m. and at 6:40 the bailiff knocked on the jury door and the jury informed him that they were "working." (Id., p. 192-94.) At 7:00 p.m., the jury notified the Court that they had reached a unanimous verdict. (Id., p. 195.) The trial court then had the jury return to the courtroom and the trial court announced the jury's verdict finding Petitioner guilty of second-degree sexual assault. (Id., p. 196.) The trial court then polled to the jury to confirm that the verdict was unanimous. (Id., pp. 196 – 197.)

Based upon a thorough review of the record, the undersigned cannot find that the trial court gave an improper *Allen* instruction. First, the undersigned finds that the trial court did not instruct the jury to return to the jury room to see if they could reach a unanimous verdict. Instead, the trial court instructed the jury to return to the jury room to see if jurors could agree as a group as to whether additional deliberation would be helpful in the jury arriving at a unanimous verdict. When questioned as a group, two jurors indicated that additional deliberations would be helpful in them arriving at a unanimous verdict. Thus, the trial court instructed the jurors to return to the jury room to see if they believed additional deliberations would be helpful. Wiggins v. Boyette, 635 F.3d 116, 127 (4th Cir. 2011)(finding an instruction that "simply explained to the jurors that they should continue to deliberate" to be non-coercive); United States v. Brown, 2017 WL

1750295, * 8 (E.D.N.C. May 3, 2017)(finding that the trial court's instruction that "it was included to relieve the jury of its obligations to continue to deliberate" but before doing so, the court wanted the jurors to discuss further whether or not they could reach a unanimous verdict was not coercive); also see United States v. Meraz-Fugon, 2017 WL 544591, * 2 (4th Cir. 2017)("Nor did the district court judge's knowledge of the jury's numerical division render the charge coercive in this instance, particularly in light of the fact that the jury's note indicating they were divided did not identify whether the majority favored conviction or acquittal.") Second, in reviewing the totality of the instruction, there is no indication that the instruction was directed at the minority or that the trial court directed jurors to surrender their individual conviction so that a unanimous verdict could be rendered. Although the trial court knew the jury was divided "six-four-two," the record clearly reveals that the trial court was unaware of how of votes were divided (guilty verses not guilty verses undecided). Third, there is no indication that the trial court suggested or threatened the jurors that they would be kept until a unanimous verdict was reached. Fourth, the trial court specifically informed the jury that it could not require the jury to reach a verdict. Finally, the record reveals that the jury deliberated for approximately 45 minutes after the trial court's instruction. The total time spent in deliberations was approximately three hours and five minutes. Thus, the duration of the deliberation time following the trial court's supplemental instruction constituted nearly a third of the deliberation time. The record reveals that approximately twenty-five minutes after the jury returned to the jury room, the trial court attempted to contact the jury to return them to the courtroom and was informed by the jury that they were "working." Clearly, the foregoing demonstrates that the jury was not coerced by the trial court. Furthermore, Petitioner has not identified any federal case in which the language used

46

by the trial court was disapproved. The undersigned, therefore, finds no indication of coercion when reviewing the instruction in its entirety and in context. Accordingly, it is respectfully recommended that Respondent's Motion for Summary Judgment be granted as to the foregoing.

**3.      Prosecutorial Misconduct:**

In his Petition, Petitioner argues that "[t]he plainly-improper remarks made by the prosecutor during the State's rebuttal closing were prejudicial enough to have denied [his] right to a fair trial and, thus, violated the due process provisions of the Fourteenth Amendment to the United States Constitution." (Document No. 1, pp. 20 – 22.) Petitioner complains that the prosecutor made improper remarks during closing based upon the following: (1) Improperly bolstering the alleged victim's testimony with "unfounded assertions about her 'psychic scars;'" (2) Improperly impeaching Petitioner's handwritten statement; and (3) Improperly evoking considerations other than the evidence of record. (Id.)

In his Motion for Summary Judgment, Respondent argues "the prosecutor's statements during his closing rebuttal argument did not rise to the level of a constitutional deprivation of Petitioner's right to due process of law." (Document No. 91, pp. 17 – 18.) Respondent states that the WVSCA determined that Petitioner did not object to the statements during trial and thus waived the ability to raise such an assignment on direct appeal absence plain error. (Id.) Considering the merits of Petitioner's claim, Respondent argues that the prosecutor's closing rebuttal did not contain remarks rising to the level of "particularly egregious errors." (Id.) Respondent further contends that this Court must "acknowledge the extent to which the prosecutor was responding to assertions made by counsel for the defense during closing arguments." (Id.) Specifically, Respondent claims that the prosecutor was responding to defense

counsel's assertion that the victim's story was "a good show," his foray blaming the victim for the incident, his appeal to the jury that they would be setting a dangerous precedent if they convicted Petitioner, and his remark that "rape is easy to charge but it's difficult to defend against." (Id., p. 18.) Respondent, therefore, concludes that this Court show not overturn the WVSCA's finding that the prosecutor's remarks fail to rise to the level of plain error. (Id.)

In Response, Petitioner argues that the prosecutor's rebuttal closing was "prejudicial enough to have denied Petitioner's right to due process." (Document No. 97, pp. 17 – 21.) First, Petitioner argues that the prosecutor's arguments as to Petitioner's "future dangerousness" and that the "community must be protected from the defendant tends to inflame the passions and prejudices of jurors, and thus, can deprive the defendant of his right to an impartial truth-finder." (Id., pp. 17 - 18.) Second, Petitioner claims that "[a]ttacking the credibility of Petitioner's handwritten statement over 'three hours' of post-assert silence was egregious enough, by itself, to constitute a due process violation." (Id., p. 19.) Third, Petitioner asserts that "[b]olstering the alleged victim's testimony with an emotionally-charged expression of personal opinion was – given the nature of the case – equally prejudicial." (Id.) Petitioner claims that the above improper remarks were not isolated. (Id.) Rather, Petitioner contends that the focus of the prosecutor's rebuttal closing was the consequences of an acquittal – not the evidence of record. (Id.) Petitioner notes that the strength of the State's case as not overwhelming because the trial was dependent upon the juror's credibility determination. (Id., p. 20.) Petitioner further asserts that the "prosecutor clearly intended to divert the jurors with considerations other than the evidence." (Id.) Petitioner disputes that the prosecutor's remarks were invited by defense counsel. (Id.) Finally, Petitioner contends that the trial court failed to give any curative instructions to limit or

correct any of the prosecutor's improper remarks. (Id., pp. 20 – 21.)

Although Petitioner challenged the prosecutor's closing remarks in his direct appeal, the WVSCA failed to address the merits of Petitioner's claim. Specifically, the WVSCA determined that Petitioner failed to object to the prosecutor's remarks at trial and thereby waived the claim. (Document No. 58-76, p. 13.) Analyzing the above claim under the "plain error" standard, the WVSCA determined prosecutor's remarks did not amount to plain error. (Id.) Where a defendant fails to make a proper, contemporaneous objection at trial and thus can secure at most a plain error review on direct appeal, this Court is "procedurally barred from considering the claim, unless [that defendant] can show cause and prejudice for his failure to preserve the issue by a timely objection." Daniels, 316 F.3d at 487. The Fourth Circuit has recognized that "procedural default is excusable under the cause and prejudice standard when the petitioner demonstrates (1) that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule, and (2) that errors at his trial . . . worked to his *actual* and substantial disadvantage, infecting his entire trial with errors of constitutional dimensions." Wolfe, 565 F.3d at 158, n. 27. Although a claim appears to be procedurally defaulted, the court should forego further consideration of the procedural default issue if the court "can more easily dispense with the claim on its merits." Hayes, 2016 WL 5662037 at *4(citing Yeatts v. Angelone, 166 F.3d 255, 261 (4th Cir. 1999)).

In the instant case, it appears that Petitioner procedurally defaulted his above claim challenging the prosecutor's closing rebuttal argument. The undersigned, however, will forego further consideration of the procedural default issue and address the merits of Petitioner's claim. With respect to claims of prosecutorial misconduct, federal *habeas* review is available only upon

a showing that the prosecutor's remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471-72, 91 L.Ed.2d 144 (1986)(quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871-72, 40 L.Ed.2d 431 (1974).). The defendant must show that the prosecutor's remarks were improper *and* that the remarks prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial. United States v. Alerre, 430 F.3d 681, 689 (4th Cir. 2005); United States v. Mitchell, 1 F.3d 235, 240 (4th Cir. 1993)(internal citations omitted). In determining whether the prosecutor's remarks were prejudicial, the Court should consider the following factors: (1) "the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused;" (2) "whether the remarks were isolated or extensive;" (3) "absent the remarks, the strength of the competent proof introduced to establish the guilt of the accused;" (4) "whether the comments were deliberately placed before the jury to divert attention to extraneous matters;" (5) "whether the prosecutor's remarks were invited by improper conduct of defense counsel"; and (6) "whether curative instructions were given to the jury." United States v. Baptiste, 596 F.3d 214, 227 (4th Cir. 2010)(quoting United States v. Wilson, 135 F.3d 291, 299 (4th Cir. 1998)); also see United States v. Bryant-Royal, 607 Fed.Appx. 258, * 262 (4th Cir. 2015); United States v. Lighty, 616 F.3d 321, 361 (4th Cir. 2010). The fact that the comments are "undesirable or even universally condemned" is insufficient to establish a due process violation. Darden, 477 U.S. at 181, 106 S.Ct. at 2471-72. Courts must conduct a fact-specific inquiry and examine the challenged comments in the context of the whole record. United States v. Young, 470 U.S. 1, 11 – 12, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985).

Reviewing the prosecutor's remarks in context of the entire proceeding, the undersigned

50

cannot find that the prosecutor's remarks violated Petitioner's right to a fundamentally fair trial. First, Petitioner alleges that the prosecutor bolstered the testimony of the victim with unfounded assertions about her "psychic scars" and appearing to be "bare and charred." (Document No. 1, p. 20 and Document No. 97, pp. 19 – 20.) The record reveals that the prosecutor's above challenged remark was made during his rebuttal closing statement in response to defense counsel's closing statements. In closing, defense counsel stated the following:

> Don't leave your common sense out of this because you have to find the truth and all I am trying to do to you is to help you find the truth. That's all the State is trying to do.
> So, now we have conflicting evidence. She says one story and I don't think she stopped crying even to the point where she said gobs of her hair fell out during a shower. She even cried during that period, too. She wasn't straight with you. So, the only thing I concluded, Ladies and Gentlemen, after a year of this thing something must be wrong if she continues to cry.
> But it isn't wrong. Do you know why? It's a good show. When you don't have anything, you make a good show. It generates emotion, and maybe you might be persuaded by emotion and the hopes you might. That's what she's hoping on.

(Document No. 88-21, p. 173.) In his rebuttal closing, the prosecutor made two isolated statements regarding the victim's "psychic scars" and one statement that the victim appeared to be "bare and charred." (Id., pp. 179, 182, and 184.) Assuming without deciding that the prosecutor's remarks were improper, the undersigned cannot find that Petitioner was prejudiced by the remarks. These remarks were made in direct response to defense counsel's theory that the victim was putting on a "good show" when she was crying while testifying about the alleged sexual assault. The prosecutor argued that the victim's demeanor was not that of an individual putting on a "good show," but was consist with the victim's testimony that she was sexually assaulted. The Fourth Circuit has held that "prosecutors enjoy considerable latitude in presenting arguments to a jury, because 'the adversary systems permits the prosecutor to 'prosecute with

earnestness and vigor.'" <u>Bates v. Lee</u>, 308 F.3d 411, 422 (4th Cir. 2002)(quoting <u>Young</u>, 470 U.S. at 7, 105 S.Ct. at 1038))("Committed advocates do no always present antiseptic closing statements, and the jury is entrusted within reason to resolve such heated clashes of competing views.") Reviewing the prosecutor's remarks in context of the entire record, that undersigned finds that the challenged remarks were isolated, had no tendency to mislead the jury, and were not deliberately placed before the jury to divert attention to extraneous matters. Since the defendant failed to object to the above remarks that he now challenges, there was no opportunity for a curative instruction. The undersigned further notes that the jury was instructed that the comments of the lawyers were not evidence and were not to be considered as matters of fact, and jurors are presumed to follow the court's instructions. (Document No. 88-20, p. 90.) Based upon the foregoing, the undersigned cannot find that the remarks violated the integrity of Petitioner's criminal proceedings or denied Petitioner due process.

Second, Petitioner alleges that the prosecutor improperly challenged the credibility of his handwritten statement that was given to police following three-hours of post-<u>Miranda</u> silence. (Document No. 1, pp. 20 - 21 and Document No. 97, pp. 19 - 20.) Again, the record reveals that the prosecutor's above challenged remark was made during the prosecutor's rebuttal closing statement in response to defense counsel's closing statements. In closing, defense counsel stated the following:

> . . . This was made immediately within two or three hours after his detention, and where did he go? The police took him home and he went to sleep. It didn't seem to me or to him that he had been committing any crime. He would have fled or done something.
> There is some doubt, serious doubt in the case. Who are you going to give it to? You have to give it to him.
> But this is the key right here and when they asked him for a waiver of his rights, what they call a Miranda warning, "Sure, give me a pen. I'll sign it. Ask me anything you want to."

That's not a sign of somebody who says, I've committed a crime and I don't want to tell you a thing until I talk with my lawyer." He freely gave it to them. He says, "Well, you are going to give us a little release too, because you know, we detained you and we don't want to be liable." "Sure, give me a release. I'll sign it. It's a mistake. Fine."

He signed it without any qualm. I want you to see those things. Is this a sign of somebody that was really committing a crime?

(Document No. 88-21, pp. 169-70.) In his rebuttal closing, the prosecutor stated as follows:

This woman has testified under oath, has given statements to the police, has given statements to a paramedic she didn't even know about on the floor below all consistent with very minor, little variations and he says - - the defendant's statement, which was made three hours after, has more credibility than a cross-examination, than a consistent story, a consistent repetition of her personal, private life. Is this - - a woman wants to come in here and enjoy this? People want to come in and hear this?

***

The statement that they gave the police was three hours - - that he gave the police written out was three hours later. Do you know there was uniformed policemen in his apartment, arresting him three hours before and there is nothing in the record, nothing in the record that shows that the statement was made to the uniformed policeman, and that uniformed policeman was subpoenaed by the defendant waiting in that room and he was never called. Three hours to make up that story and it was [the victim], folks, [the victim] who bit him.

(Id., pp. 179 – 80.) Assuming without deciding that the prosecutor's remarks were improper, the undersigned cannot find that Petitioner was prejudiced by the remarks.[8] These two isolated

---

[8] Although Petitioner asserts prosecutorial misconduct based on alleged improper remarks, Petitioner does not assert a *Doyle* error as an independent ground for *habeas* relief his Section 2254 Petition. In *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) the United States Supreme Court held that "the use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving *Miranda* warnings, violate[s] the Due Process Clause of the Fourteenth Amendment." *Doyle v. Ohio*, 426 U.S. 610, 619, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976). The foregoing "rests on 'the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial.'" *Wainwright v. Greenfield*, 474 U.S. 284, 291, 106 S.Ct. 634, 638, 88 L.Ed.2d 623 (1986)(citation omitted). The Constitution, however, does not prohibit the use of defendant's silence prior to arrest or after arrest if no *Miranda* warning is given to the defendant. *Brecht v. Abrahamson*, 507 U.S. 619, 628, 113 S.Ct. 1710, 1714, 1716, 123 L.Ed.2d 353 (1993)(citations omitted). In *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), the United States Supreme Court held that *Doyle* error does not entitled a petitioner

remarks were made in direct response to defense counsel's theory that Petitioner's statement was more creditable than any statement made by the victim and her trial testimony because the Petitioner's written statement was voluntarily made immediately upon receiving his <u>Miranda</u> warning from Detective Ball. Clearly, the prosecutor's remarks concerning the "three hours" related to the lapse of time between the occurrence of the alleged sexual assault and the time Petitioner gave his written statement. A review of the record reveals no indication that the prosecutor attempted to impeach Petitioner's written statement based upon any silence following the <u>Miranda</u> warning. Reviewing the prosecutor's remarks in context of the entire record, that undersigned finds that the challenged remarks were isolated, had no tendency to mislead the jury, and were not deliberately placed before the jury to divert attention to extraneous matters. Since the defendant failed to object to the above remarks that he now challenges, there was no opportunity for a curative instruction. The undersigned further notes that the jury was instructed that the comments of the lawyers were not evidence and were not to be considered as matters of fact, and jurors are presumed to follow the court's instructions. (Document No. 88-20, p. 90.) Based upon the foregoing, the undersigned cannot find that the remarks violated the integrity of Petitioner's criminal proceedings or denied Petitioner due process.

Third, Petitioner alleges that the prosecutor improperly "pressured" the jurors to base their decision upon improper considerations. (Document No. 1, pp. 21 - 22 and Document No.

---

to *habeas* relief unless it "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623, 113 S.Ct. 1710, 1714, 123 L.Ed.2d 353 (1993)(quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)). A review of the record as a whole is void of any indication that the prosecutor's isolated remarks had a substantial or injurious effect upon the jury's verdict. The prosecutor's disputed remarks comprised of only two short paragraphs of the nearly 450-page trial transcript. Furthermore, witness testimony corroborated that the victim's version of the alleged events remained consistent. Thus, there was sufficient evidence to establish Petitioner's guilt.

97, pp. 17 – 18, 20.) Specifically, Petitioner complains that the prosecutor informed the jury that they would be "sending a message" and protecting the community from Petitioner who had a "sweet tooth" for "masochistic, sadomasochistic horror." (Id.) Again, the record reveals that the prosecutor's above challenged remark was made during the prosecutor's rebuttal closing statement in response to defense counsel's closing statements. In closing, defense counsel made the following statements: (1) "A rape charge is very easy to make but it is most difficult to defend against . . . And a lot of innocent people – males – can be harmed for the rest of their lives" (Document No. 88-21, p. 162); (2) "It's a sad state, Ladies and Gentleman, when a woman goes into a bar late at night drinking and decides to have a very anonymous sexual encounter, a one-night stand . . . Here it's 2 o'clock in the morning. Where should she have been at that time, if she never intended to engage in something that was very intimate herself?" (Id., p. 172.); (3) "For what? Because a - - she came up and invited herself up. This is dangerous, Gentlemen. This is dangerous, and I'm going to tell you it's dangerous to even look at a women today because she can shout 'Rape' under any condition, if she comes into your apartment or you go into her apartment, and you have to disprove it and it's tough because there are only two people there and society tends to believe the woman" (Id., p. 175.); and (4) "This is not an easy case. It involves the dirt, the mud, the muck of life. It can be a beautiful thing if done within the marriage, a terrible thing done outside the marriage. God created it. We just need to use it properly." (Id., p. 177.). In his rebuttal closing, the prosecutor stated as follows:

> This is an era of modern women. Now my learned friend and myself may not be in this era but it's here and women, single women go out to bars and cafes and meet men. And your sons and daughters and my sons and his daughters will go to Marshall and to other universities and they will go to bars and cafes and groupings and they will meet men, nice men that they think are nice, men who they think are soft, men who they think are sweet, who are trickster lovers, could be, as was in this case.

And the State who I am privileged to represent in this case, privileged along with my colleague Mrs. Neal, must bring this to the attention of the community to protect, to protect our sons and our children and the single women and adult women and the modern women.

This sweet tooth of this for masochistic, sadomasochism horror cannot be allowed to escape through the mis-reading of evidence by counsel for the defense.

***

And, Ladies and Gentlemen of the Jury, believe me. This is a crucial case, very important case for the people, for yourselves, for the community. You will be sending a message. You must think about the message. You must put aside your personal beliefs. . . .

***

He had a sweet tooth for that and if you do not punish him and if you do not say it stops here - - the sentencing and punishment is all up to this Judge. It doesn't have anything to do with me. It doesn't have anything to do with anyone else but this Court; and if anything that can be said for Judge Ferguson, he's ultimately fair.

***

There were two - - there was two acts of oral intercourse, one consensual and one not. This case is about those things when a woman's body she said, "No," and she must be respected. And if you will come back with a "not guilty" you will send a message so loud and clear to men on dates who have the tendency of the sweet tooth of sadomasochism to say, "I have got you now." Ladies and Gentlemen, think of your duty. Think of the community. Think of that woman.

(Id., pp. 178, 182-84.) Assuming without deciding that the prosecutor's remarks were improper, the undersigned cannot find that Petitioner was prejudiced by the remarks. The isolated remarks were made in direct response to defense counsel's theory that the victim wanted to engage in sexual acts with Petitioner because she voluntarily entered the Petitioner's apartment at 2:00 a.m. Defense counsel specifically stressed to the male jurors that it was a "dangerous" time for men because a women frequent bars to meet men and then can yell "rape." Defense counsel further indicated fault to the victim for engaging sexual intercourse outside of marriage by stating his personal belief that "it can be a beautiful thing if done within the marriage, a terrible thing done outside the marriage." In response, the prosecutor stated that it was a "era of modern women" and jurors must put aside any personal beliefs and consider whether Petitioner committed a

sexual assault upon the victim following their consensual sexual acts.

Concerning the prosecutor's isolated remarks as to Petitioner's "sweet tooth" for masochistic, sadomasochism horror, a prosecutor is permitted to argue reasonable inferences from the evidence presented. A review of the record reveals that testimony was presented that Petitioner seemed to get enjoyment or excitement from the victim's fear. Specifically, the victim testified as follows:

Q.     Did he say anything to you at that time?

A.     He asked if I was afraid and I said, "Yes," and he said, "Good, I want you be afraid."

Q.     After saying he wanted you to be afraid what did you - - what did he do, if anything?

A.      He made me perform oral sex with him.

Q.     How did he make you do this?

A.     He stood up and he grabbed my head and he shoved himself at me.

Q.     How did he grab your head, Kathy?

A.     By my hair.

Q.     Did he just grab it or - -

A.     He pulled it.

Q.     Did he hurt you when he did that?

A.     Yes. I was pulling away.

Q.     You were resisting that? What were you pulling away? I'm sorry. Why were you pulling away?

A.     I didn't want to do that. I was scared.

Q.     And what was he doing while you were trying to resist that?

57

A.     Pulling on my head and pushing himself towards me.

Q.     Were you still scared?

A.     Yes.

Q.     Was this in any way a pleasure trip for you at this time?

A.     No.

Q.     After pulling your hair and pulling your head towards - - was it towards his body and towards this private parts; is that correct?

A.     Yes.

Q.     Did he have an erection?

A.     Yes.

Q.     Did you notice anything in particular about that erection at that particular time?

A.     No.

Q.     Did he say anything to you?

A.     He asked me if I sucked better dick when I was afraid.

Q.     Did you understand from this statement that he knew you were afraid?

A.     He kept asking me that.

Q.     Or did you understand that he wanted you to be afraid?

A.     Yes.

(Document No. 88-20, pp. 158-59.) Additionally, Deputy Ball testified as follows:

Q.     Thank you. Did she tell you that he pulled her head down to his penis?

A.     Yes.

Q.     Did she tell you he forced his body new to her face?

A.     Yes, and while doing so that he repeated more than one, "Are you afraid?

You better be afraid," and "Do you suck a mean dick when you are scared?" This type thing.

(Document No. 88-21, p. 79.) Reviewing the prosecutor's remarks in context of the entire record, that undersigned finds that the challenged remarks were isolated, had no tendency to mislead the jury, and were not deliberately placed before the jury to divert attention to extraneous matters. Since the defendant failed to object to the above remarks that he now challenges, there was no opportunity for a curative instruction. The undersigned further notes that the jury was instructed that the comments of the lawyers were not evidence and were not to be considered as matters of fact, and jurors are presumed to follow the court's instructions. (Document No. 88-20, p. 90.) Based upon the foregoing, the undersigned cannot find that the remarks violated the integrity of Petitioner's criminal proceedings or denied Petitioner due process.

**4.    Involuntary Waiver of Right to Testify:**

In his Petition, Petitioner argues that "[b]ecause [his] waiver of the right to testify was based on misleading statements made by the court and counsel; [his] conviction was obtained in violation of the due process provisions of the Fourteenth Amendment to the United States Constitution." (Document No. 1, p. 22.) First, Petitioner contends that the trial court dissuaded him from testifying because the trial court "informed [him] that if [he] chose to take the stand, [he] would likely be cross-examined about a battery conviction and about the five other (unrelated) charges contained in [his] indictment." (Id.) Petitioner asserts that the trial court "clearly conveyed that such questioning would be proper - - even though the State had not identified a single, legitimate purpose for introducing evidence of previous misconduct." (Id.) Second, Petitioner claims that defense counsel "informed [him] that, even if [he] did not place [his] character or reputation in issue while testifying, the State would 'definitely' be allowed to

reveal the battery conviction and other counts in [his] indictment during cross-examination." (Id.) Petitioner states that he "began the trial wanting to testify" and his "decision to waive the right to testify was based solely upon the misleading statements made by the court and counsel." (Id.)

In his Motion for Summary Judgment, Respondent argues "Petitioner knowingly, intelligently, and voluntarily waived his right to testify." (Document No. 91, pp. 18 – 19.) Respondent states that the WVSCA properly determined that "[P]etitioner failed to show that the court made any grossly erroneous misstatements concerning the possible admissibility of [P]etitioner's prior conviction, charges, and wrongful acts during cross-examination. The same can be said of [P]etitioner's trial counsel's advice and statements to him concerning the dangers of him taking the stand." (Id.) Respondent notes that Petitioner was warned that if he testified, he was risking opening the door to Rule 404(b) evidence of prior convictions and bad acts, including those arising in unrelated charges. (Id., p. 19.) The trial court further reminded Petitioner that he had two statements admitted into evidence wherein the jury heard him declare that he was not guilty. (Id.) Accordingly, Respondent argues that Petitioner's above claim should be denied. (Id.) Petitioner failed to address the above issue in his Response. (Document No. 97.)

Petitioner challenged the waiver of his right to testify on direct appeal relying solely upon State law. The WVSCA, however, found no merit in Petitioner's assertion of error. (Document No. 88-13, pp. 11 – 13.) Thus, the undersigned finds that Petitioner's current *habeas* claim alleging a violation of federal law is unexhausted. Since Petitioner has been excused from exhaustion based upon the inordinate delay of his State *habeas* proceedings, the undersigned will consider Petitioner's above claim de novo.

"A criminal defendant has a fundamental constitutional right to testify on his or her own

behalf at trail." United States v. Rashaad, 249 Fed.Appx. 972 (4th Cir. 2007)(citing United States v. Midgett, 342 F.3d 321, 325 (4th Cir. 2003)). A defendant may choose to waive this right, and that waiver must be made voluntarily and knowingly. Id. at 973. The Fourth Circuit has held that "this court and the majority of our sister circuits have clearly held that '[t]o waive the right [to testify], all the defendant needs to know is that a right to testify exists,' and the [trial] court need not advise the defendant of the right nor obtain a waiver." United States v. Sharp, 400 Fed.Appx. 741, 749 (4th Cir. 2010)(quoting United States v. McMeans, 927 F.2d 162, 163 (4th Cir. 1991); also see Sexton v. French, 163 F.3d 874, 882 (4th Cir. 1998)("trial counsel, not the court, has the primary responsibility for advising the defendant of his right to testify and for explaining the tactical implications of doing so or not."); Gilmore v. Stevenson, 2015 WL 4771869, * 11 (D.S.C. Aug. 12, 2015)("[I]t is not objectively unreasonable for trial counsel to await the trial court's ruling on the admissibility of a prior conviction at trial to advise a defendant whether to testify or not . . .."). "[T]he advice provided by a criminal defense lawyer on whether his client should testify is 'a paradigm of the type of tactical decision that cannot be challenged as evidence of ineffective assistance.'" Carter v. Lee, 283 F.3d 240, 249 (4th Cir. 2002)(quoting Hutchins v. Garrison, 724 F.2d 1425, 1436 (4th Cir. 1983). Courts, however, have found ineffective assistance of counsel where defendants clearly acceded to trial counsel's advice and trial counsel is later found to have misinformed the defendant concerning the consequences of taking the stand. See Blackburn v. Flotz, 828 F.2d 1177, 1182 (6th Cir. 1987); United States v. Poe, 352 F.2d 639 (D.C. Cir. 1965). To the extent Petitioner is alleging ineffective assistance of counsel, the undersigned will consider his claim in Section 6(C) below.

A review of the record reveals at the conclusion of the first day of trial, the trial court

addressed the potential admission of 404(b) evidence if Petitioner were to take the stand. The trial court clearly indicated that the court would not allow the second victim (Teresa Salow), as charged Counts 2 – 5 of the Indictment, to testify in the case-in-chief. (Document No. 88-20, pp. 244-47.) The trial court, however, indicated that if Petitioner took the stand and presented testimony opening the door, 404(b) evidence concerning Teresa Salow might be admissible as impeachment evidence. (<u>Id.</u>) The trial court stressed that it could not make a definite decision because the trial court did not know what Petitioner was going to testify to on direct examination. (<u>Id.</u>) Following the conclusion of the State's evidence, and outside the presents of the jury, trial counsel informed the court that Petitioner had decided not to testify. (Document No. 88-21, p. 103.) At that point, Petitioner stated that he had discussed his options with trial counsel "and what could happen either way and after asking them a few questions, I decided not to take the stand." (<u>Id.</u>, pp. 103-04.) In Response, the trial court stated as follows:

> Of course, you got the statement into the jury two times[9] he is not guilty, one he told the jury was he was not guilty and one in the statement, and I don't - - if I were trying the case I don't know how you could do much better than that. That is your decision to make. That way you don't subject yourself to any questions. That is probably not a bad decision, but only time will tell.

(<u>Id.</u>, p. 104.) In light of the foregoing, the undersigned finds that Petitioner was not coerced or prevented from testifying. Instead, Petitioner chose not to testify after discussing his right to take the stand with his attorneys and the trial court's indication that there was a *possibility* that certain prior acts evidence could be admissible. To the extent Petitioner is alleging that the trial court was incorrect in its determination that certain prior acts evidence could be admissible, the State

---

[9] The trial court was referring to Petitioner's "statement" of not guilty offered at the beginning of the trial, and Petitioner's written statement made subsequent to his arrest. Petitioner's written statement denying any sexual assault was read to the jury without objection. (Document No. 88-21, p. 60.)

court's decision on a question of state law is not subject to review by a federal *habeas* court. See Roache v. Angelone, 176 F.3d 210, 217 (4th Cir. 1999). Thus, Petitioner's claim that the trial court improperly instructed him concerning the scope of admissible evidence on cross-examination is not subject to review by this Court. The undersigned, therefore, respectfully recommends that Respondent's Motion for Summary Judgment be granted as to the above ground.

**5.    Enhancement of Petitioner's sentence:**

In his Petition, Petitioner argues that "[b]ecause the trial court lacked jurisdiction to enhance [his] sentence under West Virginia's recidivist statute, its imposition of a life sentence violated the due process provisions of the Fourteenth Amendment to the United States Constitution." (Document No. 1, p. 23.) Petitioner claims that the "West Virginia recidivist statute requires that where the prosecutor files a timely recidivist information, the defendant must be made to answer that information before the expiration of the term at which he was convicted." (Id.) Petitioner states that the term he was convicted in ended on September 12, 1993, and he was "not made answer the information until February 14, 1994. (Id.)

In his Motion for Summary Judgment, Respondent argues the "Circuit Court did not lack jurisdiction to impose a recidivist sentence upon Petitioner because Petitioner requested a continuance of the recidivist hearing until the next term of court." (Document No. 91, p. 20.) Respondent explains that on September 9, 1993, two days after Petitioner received the State's Information, Petitioner requested a continuance. (Id.) Respondent contends that the Circuit Court notified Petitioner that it was willing to grant the continuance as long as Petitioner acknowledged that such would push his arraignment on the recidivist charge to the next term of court, and

Petitioner waived his right to allege a denial of his right to a speedy trial under recidivist statute. (Id.) Respondent argues that Petitioner agreed to the foregoing and was granted the continuance. (Id.) Therefore, Respondent asserts that Petitioner's invited the above error and such fails to rise to the level of constitutional dimension. (Id.)

In Response, Petitioner continues to argue that the enhancement of his sentence violated Due Process. (Document No. 97, pp. 21 – 23.) Petitioner explains that the trial court's power to impose an enhanced sentence derived solely from West Virginia Code § 61-11-18. (Id., p. 21.) Petitioner contends that before a court can impose an enhanced sentence pursuant to the above statute, it must fully comply with its procedures that require a defendant to be arraigned within the same term of court. (Id.) Petitioner maintains that it is irrelevant that he requested a continuance. (Id.) Petitioner alleges that the trial court's failure to conduct the recidivist arraignment within the same term of court was "the result of a lack of familiarity with the intricacies of the recidivist law" by both the trial court and the prosecutor. (Id., pp. 21 – 22.) Petitioner asserts that "[i]f the court had been aware or had been made aware that a formal arraignment in the same term was mandatory, it could have ordered a much shorter postponement or simply denied Petitioner's request and proceeded with the arraignment." (Id., pp. 22 – 23.)

Regarding Petitioner's above *habeas* claim, the WVSCA addressed the issue, in pertinent part, as follows:

> In the instant case, the jury returned a guilty verdict against petitioner on August 19, 1993. That same day, the State indicated its intent to have petitioner sentenced as a habitual criminal. On August 30, 1993, an information alleging prior felony convictions was filed. On September 9, 1993, petitioner was brought before the trial court. At the September 9, 1993, hearing, petitioner asked the trial court for time to review the information and recidivist statute, so that he could properly admit or deny that he was the person named in the information. During the September 9, 1993, hearing, the following exchange took place between the court and petitioner:

| PETITIONER: | Your Honor, I – as I said, I was only served with this thing at 4 o'clock Tuesday. I believe there's some case law that indicates I should have time. The whole purpose of having this written is so that it can be presented to me and I can have some time to review the facts in here and decide . . . what I should do. |
|---|---|
| THE COURT: | I am willing to give you that time so long as we don't have any claim of a denial of a speedy trial. As I recall the law, it doesn't require that you have your trial within the same Term of Court, in which we are right at the end of the Term. We have got a week left. |

In support of his position, petitioner cites *State v. Cavallaro*, 210 W.Va. 237, 557 S.E.2d 291 (2001) and *Holcomb v. Ballard*, 232 W.Va. 253, 752 S.E.2d 284 (2013). In *Cavallaro*, the trial court found a recidivist life imprisonment sentence void and unenforceable because the State failed to comply with the requirements of West Virginia Code § 61-11-19, insofar as defendant was not arraigned on the information during the term of court in which he was convicted of the principle offense. The *Holcomb* Court ruled in syllabus point one, in part, that "[t]he procedural recidivist requirements of W.Va. Code § 61-11-19 (1943) (Repl. Vol. 2010) are mandatory, jurisdictional, and not subject to harmless error analysis." The *Holcomb* Court further noted that habitual criminal proceedings providing for enhanced or additional punishment on proof of one or more prior conviction are wholly statutory. In such proceedings, a court has no inherent or common law power or jurisdiction. Being in derogation of the common law, such statutes are generally held to require strict constructions in favor of the prisoner. Hence, petitioner contends that the law is well settled that the trial court lacked jurisdiction to enhance petitioner's sentence to a life sentence under the habitual criminal statutes.

We explained the concept of "invited error" in *State v. Crabtree*, 198 W.Va. 620, 627, 482 S.E.2d 605, 612 (1996):

"Invited error" is a cardinal rule of appellate review applied to a wide range of conduct. It is a branch of the doctrine of waiver which prevents a party from inducing inappropriate or erroneous response and then later seeking to profit from that error. The idea of invited error is not to make the evidence admissible but to protect principle underlying notions of judicial economy and

integrity by allocating appropriate responsibility for inducement of error. Having induced an error, a party in a normal case may not at a later stage of trial use the error to set aside its immediate and adverse consequences.

It is clear, from our review of the record, that petitioner requested a delay in his arraignment on the recidivist information. The circuit judge granted petitioner's request for postponement and stated "I am willing to give you that time so long as we don't have any claim of a denial of a speedy trial." Thus, we find that any delay with respect to petitioner's arraignment on the recidivist information was brought about at the request of petitioner. Consequently, based upon our holding in *Crabtree*, we find no error.

(Document No. 88-13, pp. 9 – 11.)

The undersigned finds that Petitioner's above claim is without merit because there is no evidence that the WVSCA's determination was contrary to, or an unreasonable application of, clearly established federal law; or based on an unreasonable determination of facts. Petitioner argues that the trial court lacked "jurisdiction" as to his recidivist conviction because the trial court failed to comply with the same term rule as set forth in West Virginia Code § 61-11-19.[10]

---

[10] West Virginia Code § 61-11-19 provides as follows:

It shall be the duty of the prosecuting attorney when he has knowledge of former sentence or sentences to the penitentiary for any person convicted of an offense punishable by confinement in the penitentiary to give information thereof to the court immediately upon conviction and before sentence. Said court shall, before expiration of the term at which such person was convicted, cause such person or prisoner to be brought before it, and upon an information filed by the prosecuting attorney, setting forth the records of conviction and sentence, or convictions and sentences, as the case may be, and alleging the identity of the prisoner with the person or not. If he says he is not, or remains silent, his plea, or the fact of his silence, shall be entered of record, and a jury shall be impaneled to inquire whether the prisoner is the same person mentioned in the several records. If the jury finds that he is not the same person, he shall be sentenced upon the charge of which he was convicted as provided by law; but if they find that he is the same, or after being duly cautioned if he acknowledged in open court that he is the same person, the court shall sentence him to such further confinement as is prescribed by section eighteen of this article on a second or third conviction as the case may be.

66

The Fourth Circuit addressed a similar claim in <u>Vance v. Hedrick</u>, 659 F.2d 447 (4th Cir. 1981). In <u>Vance</u>, a petitioner challenged his recidivist conviction because his recidivist information was filed in a different term of court than his recidivist arraignment and trial. <u>Vance v. Hedrick</u>, 659 F.2d 447, 448 (4th Cir. 1981), <u>cert. denied</u>, ___ U.S. ___, 102 S.Ct. 2246, 72 L.Ed.2d 854 (1982). The Fourth Circuit, however, reversed the Northern District of West Virginia's granting of *habeas* relief based upon petitioner's argument that the trial court lacked "jurisdiction" due to the failure to comply with the "same term rule" contained in West Virginia Code § 61-11-19. <u>Id.</u> The Fourth Circuit first explained that the WVSCA's characterization of a statutory requirement as "jurisdictional" does not control the reach of the federal writ of *habeas corpus*. <u>Id.</u> at 449. Specifically, the Fourth Circuit explained as follows:

> For its purpose, the courts of West Virginia may characterize such statutory requirements as jurisdictional. Doing so may enhance a state supreme court's capacity to control procedures in the trial courts. How West Virginia characterizes statutory defects, however, has nothing to do with the reach of a federal writ of habeas corpus. The reach of the federal writ is defined by federal law. The dimension of the federal writ is not to be determined by West Virginia's highest court. It can neither be enlarged nor contracted by the court's choice of labels in referring to particular defaults or omissions.

<u>Id.</u>(internal citation omitted.) Next, the Fourth Circuit determined that Mr. Vance was not entitled to federal *habeas* relief because "[t]here was no unfairness in the proceeding; he suffered no prejudice by the postponement of the confrontation and trial from September 2 to October, a postponement requested by the lawyer in Vance's interest." <u>Id.</u> The Fourth Circuit determined that Mr. Vance would only be entitled to *habeas* relief if there was no jurisdiction to try him on the recidivist charge at the outset. <u>Id.</u> at 451. In support, the Fourth Circuit stated as follows:

> West Virginia's "same term" requirement for recidivist proceedings is comparable to the time requirement of a speedy trial act or to a statute of limitations. It is different in the sense that the same term requirement is variable. If a trial on the charge is held early in the four-month term, there is little

likelihood of encountering any problems in meeting the same term requirement. If the trial occurs late in the term, the limitations period is very short. Defense counsel then, indeed, may need more time to prepare for the recidivist trial and to advise his client about his plea. In fairness to an offender in such a situation, the same term requirement should be subject to waiver, which well may be the view of West Virginia's Supreme Court of Appeals judging from its dispositions of Vance's direct appeal and his petition for habeas corpus.

Most of the federal courts that have considered the question have held that time bars to the prosecution or trial of criminal cases, as of civil cases, are affirmative defenses which may be waived. The rule commends itself to us.

Id. at 452(internal citations omitted). Therefore, the Fourth Circuit held Mr. Vance was not entitled to federal *habeas* relief where the recidivist claim "was promptly asserted, and the confrontation and trial would have occurred before the expiration of the May term but for the fact that defense counsel sought more time for preparation." Id. at 452. Similar to Vance, Petitioner's recidivist arraignment and trial could have occurred in the same term of court but for Petitioner's request for a continuance.[11] There is no allegation or indication of unfairness in the recidivist proceeding or that Petitioner suffered prejudice by the postponement. Further, Petitioner does not allege a lack jurisdiction at the outset of the filing of the recidivist information. Rather, Petitioner contends that "jurisdiction" was lost because his arraignment was not held within the same term

---

[11] In denying Petitioner's Motion to Dismiss the Recidivist Information, the trial court noted that Petitioner initially requested a continuance to review the Information. In the meantime, Petitioner filed a Motion to Set Aside the Verdict, which included claims of ineffective assistance of counsel. The trial court noted that it took "a lot of testimony, a lot of legal arguments, and weather and everything" resulted in the arraignment being scheduled for February 14, 1994. (Document No. 88-26, pp. 95 – 96.) Specifically, the record reveals that the trial court conducted hearings on Petitioner's Motion to Set Aside Verdict on December 1, 1993, December 6, 1993, December 20, 1993, and February 14, 1994. (Document Nos. 88-23, 88-24, 88-25, 88-26.) The record further reveals that the trial court continued the motions hearing from December 20, 1993, to February 14, 1994, to give Petitioner the opportunity to present Correctional Officer Ron Carter as a witness. (Document No. 88-26, pp. 97 – 98.) Although Petitioner argued that he could have been arraigned on the recidivist information prior to a ruling on his Motion to Set Aside the Verdict, the trial court explained that "logically it doesn't make any sense for me to conduct that hearing until I make sure that there is a valid [third] conviction." (Document No. 88-26, pp. 95 – 96.)

of court as his conviction. Finally, Petitioner fails to cite any federal cases supporting his claim. The undersigned, therefore, respectfully recommends that Respondent's Motion for Summary Judgment be granted as to the above ground.

**6.     Ineffective Assistant of Counsel:**

In his Petition, Petitioner argues that "[b]ecause [he] was not provided with effective assistance of counsel, [his] conviction was obtained in violation of the Sixth Amendment to the United States Constitution." (Document No. 1, pp. 23 - 25.) First, Petitioner argues that trial counsel "failed to object when the prosecutor repeatedly adduced inadmissible hearsay testimony from Ginger Mascari." (<u>Id.</u>, p. 24.) Petitioner contends that "[t]his unobjected-to hearsay had the purpose and effect of bolstering the testimony of the alleged victim." (<u>Id.</u>) Petitioner claims that trial counsel's failure to object was not a strategic decision. (<u>Id.</u>) Second, Petitioner claims that trial counsel "failed to locate and subpoena the three other individuals who had been in the apartment with Mascari." (<u>Id.</u>) Plaintiff claims that "[e]ach of these individuals could have provided testimony that conflicted with portions of Mascari's testimony." (<u>Id.</u>) Third, Petitioner argues that trial counsel failed to familiarize himself with Rule 404(b) even though "the State had declared its intent to introduce evidence of [his] previous misconduct months prior to trial." (<u>Id.</u>) Petitioner alleges that because of trial counsel's "ignorance," trial counsel "was unable to counter the State's threat to subject [Petitioner] to an improper cross-examination – to question [Petitioner] about [his] prior convictions and the other counts in [his] indictment." (<u>Id.</u>) Petitioner states trial counsel's "ignorance" misled Petitioner to waiving his right to testify. (<u>Id.</u>) Fourth, Petitioner contends that trial counsel was ineffective concerning the jury and the alleged time limitation placed upon the trial. (<u>Id.</u>) Specifically, Petitioner argues that trial counsel was

ineffective in failing to do the following: (1) request that Angela Adams and Earl Perry be excused from serving on the jury; (2) objecting to the trial court's "arbitrary imposition of a two-day time limit," "gratuitous reminders about the time limit," and "its threat to incarcerate Adams and Perry;" (3) failing to ensure that "jurors were properly instructed upon the duty of reasonable dissent or to object to the court's unbalanced unanimity instruction;" and (4) failing to object to the trial court's alleged "coercive supplemental remarks." (Id., pp. 24 – 25.) Fifth, Petitioner argues that trial counsel was ineffective in failing to object to the prosecutor's closing argument commenting upon Petitioner's post-Miranda silence, explicit statement of personal opinion, "send-a-message argument," and "predictions about the consequences of an acquittal." (Id., p. 25.)

Indigent criminal defendants have the constitutional right to effective assistance of counsel through direct appeal. Anders v. California, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967) The burden is on the petitioner to prove that his trial attorney failed to render effective assistance. Strickland v. Washington, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984). In Strickland, the Court adopted a two-pronged test for determining whether a defendant received adequate assistance of counsel. Id. The first prong is competence. The movant must show that the representation fell below an objective standard of reasonableness. Strickland, 466 U.S. at 687 - 691, 104 S.Ct. at 2064 - 2066. There is a strong presumption that the conduct of counsel was in the wide range of what is considered reasonable professional assistance, and a reviewing Court must be highly deferential in scrutinizing the performance of counsel. Strickland, 466 U.S. at 688-89, 104 S.Ct. at 2065 - 2066.

> A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light

of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. . .. [C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

Strickland, 460 U.S. at 690, 104 S.Ct. at 2066. The Court will not second-guess an attorney's tactical decisions unless they appear unreasonable in view of all of the circumstances. Goodson v. United States, 564 F.2d 1071, 1072 (4th Cir. 1977). The second prong is prejudice. The petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S.Ct. at 2068; Hill v. Lockhart, 474 U.S. 52, 59, 106 S.Ct. 366, 370, 88 L.Ed.2d 203 (1985). An attorney's mere mistake, ignorance or inadvertence does not suffice for proof of ineffective assistance. Murray v. Carrier, 477 U.S. 478, 106 S. Ct. 2639, 2645-46, 91 L.Ed.2d 397 (1986)("So long as a defendant is represented by counsel whose performance is not constitutionally ineffective under the standard established in Strickland v. Washington, . . . we discern no inequity in requiring him to bear the risk of attorney error that results in a procedural default.") The petitioner must therefore show (1) that his attorney's performance was constitutionally inadequate, i.e., that he committed errors so serious that his performance "fell below an objective standard of reasonableness" and (2) that his attorney's performance prejudiced him such that it rendered the proceeding fundamentally unfair or made the result unreliable. Strickland, 466 U.S. at 687 - 88, 104 S.Ct. at 2064 - 2065; Fitzgerald v. Thompson, 943 F.2d 463 (4th Cir. 1991), cert. denied, 502 U.S. 1112, 112 S.Ct. 1219, 117 L.Ed.2d 456 (1992).

### A.    *Counsel's failure to object to hearsay:*

In his Motion for Summary Judgment, Respondent first argues the "Petitioner fails to adequately support his claim of ineffective assistance of counsel." (Document No. 91, pp. 21 - 22.) Respondent claims that the facts pled by Petitioner fail to show either that counsel's actions were objectively unreasonable or that Petitioner suffered unconstitutional prejudice as a result." (Id.) Respondent argues that trial counsel failed to object the Ms. Mascari's hearsay testimony based upon trial strategy. (Id., pp. 22 – 23.) Respondent contends that trial counsel used the hearsay testimony from Ms. Mascari to show that Petitioner did not force Ms. Young to perform oral sex on Petitioner. (Id.) Specifically, Respondent notes that trial counsel was able to establish that Ms. Young never told Ms. Mascari that Respondent forced to her perform oral sex. (Id.)

In Response, Petitioner continues to argue that trial counsel was ineffective in failing to object to the State's introduction of hearsay evidence in its case in chief. (Document No. 97, p. 24.) Petitioner disputes Respondent's argument that trial counsel's failure to object to hearsay testimony was "part of some 'strategy.'" (Id.)

First, the undersigned cannot find that trial counsel's failure to object to the alleged hearsay was unreasonable. Petitioner indicates that trial counsel should have objected to Ms. Mascari's testimony concerning what Ms. Young told her regarding the events that took place in Petitioner's apartment. (See Document No. 88-20, pp. 218-20.) Even if the testimony was objectionable, trial counsel was well within his range of reasonable professional conduct to choose not to object because Ms. Young had already testified as to the same matter. Further, it is reasonable that trial counsel's decision to not object was strategic. Trial counsel clearly used Ms. Mascari's testimony to stress that Ms. Young never told Ms. Mascari that Petitioner forced her to perform oral sex. (Document No. 88-20, pp. 241-42.) "[S]trategic choices made after thorough

investigation of law and facts relevant to plausible options are virtually unchallengeable." Strickland, 466 U.S. at 690, 104 S.Ct. at 2065. Furthermore, it is well recognized that classic tactical decisions may be made *without* a defendant's consent. See Sexton v. French, 163 F.3d 874, 885 (4th Cir. 1998)(emphasis added). Specifically, "[d]ecisions that may be made without the defendant's consent 'primarily involve trial strategy and tactics,' such as 'what evidence should be introduced, what stipulations should be made, what objections should be raised, and what pre-trial motions should be filed." Id.(citing United States v. Teague, 953 F.2d 1525, 1531 (11th Cir. 1992)). Further, there is no indication that Petitioner was prejudiced by counsel's failure to object. There is no indication that Ms. Mascari's testimony tipped the creditability scale in favor of the victim or that Petitioner's would not have been convicted but for the hearsay testimony. See Henh Chu Ngo v. Holloway, 551 Fed.Appx. 713, 718 (4th Cir. 2014)(Petitioner's "speculative argument that it was the singular power of the Ellis testimony that tipped the credibility of Le and Phuc in favor of the prosecution is just that, speculation, and the district court was right to reject it.") Accordingly, the undersigned respectfully recommends that Respondent's Motion for Summary Judgment be granted as to above issue.

  **B.**  ***Failure to subpoena witnesses:***

  In his Motion for Summary Judgment, Respondent first argues the "Petitioner fails to adequately support his claim of ineffective assistance of counsel." (Document No. 91, pp. 21 - 22.) Respondent states that even though Petitioner contends that trial counsel was ineffective in failing to call three additional witnesses who were in Ms. Mascari's apartment at the time of the incident, Petitioner fails to show how those witnesses were necessary or beneficial to his defense. (Id., p. 23.) Respondent further notes that the record reveals that counsel attempted to find the

three witnesses, but was unable to do so (See Document No. 88-24, p. 42.). (<u>Id.</u>) Additionally, Respondent notes that counsel's detective had taken notarized statements from some of the witnesses and their statements were duplicative of the testimony of John Romeo. (<u>See</u> Document No. 88-24, pp. 41 and 70 and Document No. 88-21, pp. 31 – 35.) Thus, Respondent contends that Petitioner cannot establish either prong of the <u>Strickland</u> standard. (<u>Id.</u>) Petitioner failed to address the foregoing in his Response. (Document No. 97, pp. 23 - 25.)

"[T]he decision whether to call a defense witness is a strategic decision demanding the assessment and balancing of perceived benefits against perceived risks, and on to which we must afford enormous deference." <u>United States v. Terry</u>, 366 F.3d 312, 317-18 (4th Cir. 2004)(counsel's decision not to call certain witnesses was reasonable based upon his professional judgment); <u>also see</u> <u>Strickland</u>, 466 U.S. at 690, 104 S.Ct. at 2065("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."); <u>United States v. Champman</u>, 593 F.3d 365, 369 (4th Cir. 2010)(even if defendant disagrees, "which witnesses to call is a classic tactical decision left to counsel"); <u>United States v. Best</u>, 219 F.3d 192, 201 (2nd Cir. 2000)(the failure to call witnesses, even those who might offer mitigating evidence, is not ordinarily viewed as a lapse in professional judgment); <u>Goodson v. United States</u>, 564 F.2d 1071, 1072 (4th Cir. 1977)(the failure to call witnesses is a tactical decision that generally does not amount to ineffective assistance of counsel). It is well recognized that tactical decisions, such as which witness to call, are "virtually unchallengeable." <u>Powell v. Kelly</u>, 562 F.3d 656, 670 (4th Cir. 2009)(quotation marks omitted); <u>United States v. Orr</u>, 636 F.3d 944, 955 (8th Cir. 2011)("[W]e consistently have affirmed that a defense counsel's decision not to call a witness is a virtually unchallengable decision of trial

strategy."); Hall v. Thomas, 611 F.3d 1259, 1293 (11th Cir. 2010)("[T]he decision concerning which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess."); Boyle v. McKune, 544 F.3d 1132, 1139 (10th Cir. 2008)("[T]he decision of which witnesses to call is quintessentially a matter of strategy for the trial attorney."). Furthermore, Petitioner fails to allege any facts supporting his claim that counsel was unreasonable in his failure to subpoena the above witnesses or how he was prejudice by such. See Bassette v. Thompson, 915 F.2d 932, 940-41 (4th Cir. 1990)(petitioner must proffer evidence of what the witnesses testimony would have been and cannot establish ineffective assistance of counsel based on a general claim that additional witnesses should have been called); United States v. Ashimi, 932 F.2d 643, 650 (7th Cir. 1991)(a defendant who faults counsel for not calling a witness cannot simply state the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance of counsel claim); Slate v. Vargo, 2014 WL 3378627, * 7 (E.D.Va. July 8, 2014)("In federal jurisprudence it is well established that a claim of ineffective assistance predicated on the failure to call witnesses fails where affidavits verifying the witnesses' testimony are not provided."); Johnson v. McCall, 2010 WL 936726, * 4 (D.S.C. March 15, 2010)("[M]ere speculation what the witnesses' testimony would have been cannot, by itself, satisfy the applicant's burden of showing prejudice.") Based upon the foregoing, the undersigned respectfully recommends that Respondent's Motion for Summary Judgment be granted as to the above issue.

### C.    *Counsel's alleged failure to advise of right to testify:*

In his Motion for Summary Judgment, Respondent argues that Petitioner cannot satisfy either prong of the Strickland standard. (Document No. 91, pp. 23 - 24.) Respondent contends

that "Petitioner was informed by both the circuit court and his counsel of the possible dangers should he choose to testify, including the risk of opening the door to further 404(b) evidence that the State was otherwise barred from introducing." (Id., p. 23.) Respondent asserts that "[s]uch advice was not in error, meaning that Petitioner cannot prove that counsel's performance was objectively deficient." (Id., pp. 23 – 24.) Furthermore, Respondent argues that Petitioner cannot establish that he was prejudiced by counsel's conduct. (Id., p. 24.) Respondent explains that Petitioner "fails to provide any indication of how his testimony could affect the outcome of the trial." (Id.)

In Response, Petitioner continues to argue that trial counsel was ineffective regarding his advice to Petitioner regarding his right to testify. (Document No. 97, pp. 24 - 25.) Petitioner contends that the record reveals that trial counsel failed to familiarize himself with the law concerning "other crime" evidence. (Id.) Petitioner contends that "[d]espite this lack of knowledge, trial counsel advised Petitioner that evidence of his battery conviction and of the remaining counts in his indictment would be admissible during cross-examination if Petitioner chose to testify." (Id., pp. 24 – 25.)

To established a claim of ineffective assistance of counsel on the basis of the right to testify, Petitioner "must show both that his attorney violated his right to testify and that his testimony had a 'reasonable probability' of changing the outcome." Rashaad, 249 Fed.Appx. at 973. The Fourth Circuit has stated that "trial counsel, not the court, has the primary responsibility for advising the defendant of his right to testify and for explaining the tactical implications of doing so or not." Sexton, 163 F.3d at 882. Accordingly, the undersigned first considers whether counsel advised Petitioner of his right to testify. The record clearly reveals that trial counsel

76

advised Petitioner of his right to testify and explained the tactical implications of Petitioner taking the stand. (Document No. 88-21, pp. 103-04.) Specifically, Petitioner stated as follows: "We talked about my options and what could happen either way and after asking them a few questions I decided not to take the stand." (Id.) The undersigned therefore finds that counsel advised Petitioner concerning his right to testify and explained the tactical implications of doing so. Courts, however, have found ineffective assistance of counsel where defendants clearly acceded to trial counsel's advice and trial counsel is later found to have misinformed the defendant concerning the consequences of taking the stand. See Blackburn, 828 F.2d at 1182; Poe, 352 F.2d at 639. In the instant case, the trial court indicated that if Petitioner took the stand his prior bad acts might be admissible as impeachment evidence depending upon Petitioner's testimony. (Exhibit 88-20, pp. 239-42.) Based upon the foregoing, trial counsel advised Petitioner to not take the stand. See Gilmore, 2015 WL 4771869 at * 11 ("[I]t is not objectively unreasonable for trial counsel to await the trial court's ruling on the admissibility of a prior conviction at trial to advise a defendant whether to testify or not . . . ."); also see Carter, 283 F.3d at 249("[T]he advice provided by a criminal defense lawyer on whether his client should testify is 'a paradigm of the type of tactical decision that cannot be challenged as evidence of ineffective assistance.'") Thus, the undersigned cannot find that trial counsel acted unreasonably in advising Petitioner to not take the stand.

Even assuming Petitioner could establish that trial counsel acted unreasonably, Petitioner cannot establish that he was prejudiced by trial counsel's advice that Petitioner not take the stand. Petitioner fails to show that his testimony had a 'reasonable probability' of changing the outcome of criminal trial. Petitioner merely complains that trial counsel "misled" him into waiving his

77

right to testify. Petitioner fails to explain what his testimony would have entailed or how such testimony would have changed the outcome of his trial. (Document No. 1, p. 24.) The record reveals that Petitioner's statement explaining Petitioner's version of the events was admitted into evidence and read to the jury. (Document No. 88-21, p. 60.) In his statement, Petitioner clearly denied that he sexually assaulted Ms. Young. (Id.) Petitioner explained that he slapped Ms. Young after she bit him on the chest and Ms. Young became angry and run out of the apartment yelling. (Id.) Furthermore, trial counsel elicited testimony from Detective Ball verifying that Petitioner had a red mark on his chest where Ms. Young allegedly bit Petitioner. (Id., p. 61.) In view of foregoing, there is no "reasonable probability" that the outcome of Petitioner's trial would have been different had he testified. It is certainly possible that Petitioner would have been subjected to extensive cross-examination concerning his prior convictions or other bad acts, and possibly impeached had he taken the stand. Based upon the foregoing, the undersigned respectfully recommends that Respondent's Motion for Summary Judgment be granted as to the above ground.

### D.    *Trial counsel's failure to strike jurors and object to trial court's instructions:*

In his Motion for Summary Judgment, Respondent argues that Petitioner cannot satisfy either prong of the Strickland standard. (Document No. 91, pp. 24 - 25.) First, Respondent contends that Petitioner's claim is speculative that Jurors Adams and Perry prejudiced his case and trial counsel was unreasonable in failing to strike them from the venire. (Id., p. 24.) Next, Respondent argues that Petitioner fails to show how trial counsel's failure to object to the trial court's continued emphasis of the desire for the trial to concluded in two days was unreasonable. (Id.) Further, Respondent claims that Petitioner fails to allege how he was prejudiced by such.

78

(<u>Id.</u>, pp. 24 – 25.)

In Response, Petitioner concludes that trial counsel was ineffective in failing "to object to the court's arbitrary imposition of a two-day limit on the trial, its gratuitous reminders about that time limit, its threat to incarcerate certain jurors if the time limit was not met, and its supplemental instruction rebuking jurors for the use of 'pride and stubbornness.'" (Document No. 97, p. 24.)

The undersigned considered and rejected Petitioner's claim concerning improper time constraints, forced deliberations, and an improper *Allen* charge in Section 2 above. Accordingly, the undersigned finds that Petitioner cannot established that trial counsel was unreasonable in failing to assert the above alleged errors, nor was Petitioner prejudiced by such failure. Accordingly, the undersigned respectfully recommends that Respondent's Motion for Summary Judgment be granted as to the above ground.

### E.    *Counsel's failure to object to the prosecutor's closing rebuttal statement:*

In his Motion for Summary Judgment, Respondent argues for the same reasons set forth in his argument that Petitioner's due process rights were not violated the by prosecutor's closing rebuttal argument, Petitioner cannot satisfy the prejudice prong of the <u>Strickland</u> standard. (Document No. 91, p. 25.)

In Response, Petitioner merely argues that trial counsel was ineffective in failing to object to the prosecutor's "improper and prejudicial closing argument." (Document No. 97, p. 23.) First, Petitioner states that "trial counsel failed – in a sexual assault trial – to object to the prosecutorial assertions about Petitioner's supposed 'sweet tooth' and to other inflammatory predictions about the consequences of an acquittal." (<u>Id.</u>) Next, Petitioner contends that in a case dependent upon

creditability determinations, "trial counsel failed to object to the prosecutor's use of poetry and personal opinion to bolster the alleged victim's credibility <u>and</u> to the prosecutor's misuse of a post-Miranda silence to impeach Petitioner's version of events." (<u>Id.</u>)

The undersigned considered and rejected Petitioner's claim of prosecutorial misconduct in Section 3 above. Accordingly, the undersigned finds that Petitioner cannot established that trial counsel was unreasonable in failing to assert the above alleged errors, nor was Petitioner prejudiced by such failure. Accordingly, the undersigned respectfully recommends that Respondent's Motion for Summary Judgment be granted as to the above ground.

> ### F.    *Counsel's cumulative errors:*

In his Response, Petitioner appears to argue that the cumulative errors by trial counsel constitutes ineffective assistance of counsel. (Document No. 97, p. 25.) A claim of cumulative ineffective assistance of counsel is not a basis for *habeas* relief. <u>United States v. Hicks</u>, 307 Fed.Appx. 758, 763 (4th Cir. 2009)(finding that matters of alleged ineffective assistances of counsel "that are not unconstitutional individually cannot be added together to create a constitutional violation"); <u>Fisher v. Angelone</u>, 163 F.3d 835, 853 (4th Cir. 1998)(holding that "ineffective assistances of counsel claims, like claims of trial court error, must be reviewed individually, rather than collectively"); <u>Dodson v. United States</u>, 2013 WL 4401385, * 8 (N.D.W.Va. Aug. 15, 2013)("A cumulative ineffective assistance of counsel claim is not a basis for habeas relief because matters that are not unconstitutional individually cannot be added together to create a constitutional violation."). The Fourth Circuit has explained that where it is determined that none of counsel's actions amounted to constitutional error, "it would be odd, to say the least, to concluded that those same actions, when considered collectively," denied

petitioner effective assistance of counsel. <u>Fisher</u>, 163 F.3d at 853. In the instant case, Petitioner has failed to establish that any of the ineffective assistance of counsel claims individually constituted constitutional error. Accordingly, the undersigned finds that Petitioner's claim of cumulative ineffective assistance of counsel is without merit.

<u>**PROPOSAL AND RECOMMENDATION**</u>

The undersigned therefore hereby respectfully **PROPOSES** that the District Court confirm and accept the foregoing findings and **RECOMMENDS** that the District Court **GRANT** Respondent's Motion for Summary Judgment (Document No. 89), and remove this matter from the Court's docket.

The parties are hereby notified that this "Proposed Findings and Recommendation" is hereby **FILED**, and a copy will be submitted to the Honorable United States District Judge Robert C. Chambers. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rule 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen (14) days (filing of objections) and three (3) days (if received by mail) from the date of filing of this Proposed Findings and Recommendation within which to file with the Clerk of this Court specific written objections identifying the portions of the Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. <u>Snyder v. Ridenour</u>, 889 F.2d 1363, 1366 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985); <u>Wright v. Collins</u>, 766 F.2d 841, 846 (4th Cir. 1985);

United States v. Schronce, 727 F.2d 91, 94 (4th Cir.) cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, Judge Chambers, and this Magistrate Judge.

      The Clerk of this Court is directed to file this "Proposed Findings and Recommendation" and send a copy of the same to counsel of record.

      Dated: January 24, 2019.

_____
Omar J. Aboulhosn
United States Magistrate Judge